**Wayne Paul BURKETT, K–8595**

v.

**Thomas A. FULCOMER, Superintendent, et al., Answering Respondent Blair County District Attorney.**

**Wayne Paul Burkett, Appellant.**

**No. 91–3040.**

United States Court of Appeals, Third Circuit.

Argued Aug. 8, 1991.

Decided Dec. 20, 1991.

---

William J. Haberstroh, David C. Gorman (argued), Office of Dist. Atty., Hollidaysburg, Pa., for appellees.

Before MANSMANN and ALITO, Circuit Judges, and NEALON, District Judge.*

## OPINION OF THE COURT

MANSMANN, Circuit Judge.

Once again the saturated dockets and the apparent strain on judicial resources in Blair County, Pennsylvania, give cause for us to examine whether a state prisoner's constitutional rights to a speedy trial and due process of law have been violated by delays in post-conviction proceedings.[1] Applying the test set forth by the Supreme Court in *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), to evaluate whether delays in the criminal justice system rise to the level of a constitutional deprivation, we find that the petitioner has established both Sixth Amendment and due process violations. We will, therefore, remand the matter to the district court with instructions to grant the writ conditionally, imposing the remedy we have fashioned to alleviate the specific prejudice suffered.

### I.

The procedural posture of this case is of paramount concern, and in fact, we have previously chronicled the travails of the petitioner, Wayne Paul Burkett. *See Burkett v. Cunningham*, 826 F.2d 1208 (3d Cir.1987) (*Burkett I*).

Burkett was arrested on April 13, 1982 for the offenses of burglary, criminal attempt (rape), terroristic threats, simple assault, recklessly endangering another person and harassment, and was indicted at Criminal Action No. 284, Blair County, Pennsylvania. Upon his arrest, Burkett was incarcerated at the Blair County Prison.

Thomas S. White (argued), Dennis M. Stefan, Law Clerk, Office of Federal Public Defender, Pittsburgh, Pa., for appellant.

* Honorable William J. Nealon of the United States District Court for the Middle District of Pennsylvania, sitting by designation.

1. In earlier matters, the dilemmas caused by the backlog of criminal cases in Blair County were described. *See Burkett v. Cunningham*, 826 F.2d 1208 (3d Cir.1987), *Schandelmeier v. Cunningham*, 819 F.2d 52 (3d Cir.1986), *Hooper v. Cunningham*, Civ. No. 84–2818, 1985 W.L. 390 (W.D.Pa. Feb. 21, 1985), and *Sweitzer v. Hewitt*, 507 F.Supp. 247 (M.D.Pa.1980).

On October 1, 1982, the District Attorney's Office of Blair County requested a continuance of the trial on these charges, which was granted. Burkett's motion to dismiss for lack of timely prosecution, filed on October 15, 1982, was denied. A jury trial eventually commenced before the Honorable Thomas G. Peoples, Jr. on January 26, 1983. On January 28, 1983, the jury convicted Burkett of the felonies and misdemeanors charged. Three days later Judge Peoples found him guilty of the summary offense of harassment.

Several days later, in February of 1983, Burkett timely filed post-trial motions, but all post-trial activity came to a standstill.[2] Therefore, on March 12, 1984, more than one year after conviction, Burkett's counsel filed a petition for writ of habeas corpus with the Court of Common Pleas of Blair County, challenging Burkett's custody and alleging that the trial court's failure to sentence Burkett violated his speedy trial and due process rights.

Burkett then began an active course of correspondence with his attorney and court personnel, expressing dismay over the delay in disposition of his post-trial motions. To punctuate his dissatisfaction, on September 6, 1984, Burkett filed a *pro se* application for an evidentiary hearing to raise and preserve the issue of his counsel's ineffectiveness in failing to pursue an expeditious resolution of his claims of error. He also sought the appointment of new counsel.

Seven months after the filing of the state habeas corpus petition, and more than 28 months after Burkett's conviction, the Honorable R. Bruce Brumbaugh of the Court of Common Pleas of Blair County held a hearing on the habeas petition on October 11, 1984. At the conclusion of the hearing,

Judge Brumbaugh announced that he would render a decision in one week. Eight weeks later, however, when a decision was not forthcoming as represented, Burkett filed for relief before the Pennsylvania Superior Court on December 12, 1984.[3]

Burkett's post-trial motions were eventually scheduled for a hearing on January 23, 1985—two years after they had been filed. Burkett objected to proceeding with argument, however, because his motion alleging counsel's ineffectiveness and requesting appointment of new counsel had not yet been scheduled for a hearing. Judge Peoples postponed argument and set a hearing on counsel's ineffectiveness. On April 1, 1985, Judge Peoples conducted a hearing on Burkett's claim of ineffectiveness which included claims raised in a second motion concerning the quality of his counsel's representation on the felony and misdemeanor charges. Both motions were denied on April 2, 1985. Although Burkett appealed the denials to the Pennsylvania Superior Court, they were quashed "*sua sponte* as interlocutory." App. at 284.

Approximately two months prior to the state court hearing on counsel's effectiveness, Burkett began to seek relief via the federal system. In February of 1985, Burkett filed a writ of mandamus in Blair County in an attempt to compel his defense counsel to file for habeas relief in the federal courts. When counsel failed to initiate a federal proceeding, on March 28, 1985, Burkett filed a *pro se* petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 in the United States District Court for the Western District of Pennsylvania, alleging a violation of his speedy trial rights occasioned by the delay in sentencing in his three pending Blair County cases.[4] After a

2. Apparently the trial transcript was not filed until August 18, 1983 even though the trial itself only encompassed three days. Also, no briefing schedule concerning the post-trial motions was established.

3. Relief was denied by the Superior Court on August 28, 1985 and by the Pennsylvania Supreme Court on April 24, 1986.

4. These three cases involved separate and unrelated incidents and trials. In addition to the

conviction in January of 1983, Burkett had been convicted by a Blair County jury in November of 1981 of counts of burglary, theft, receiving stolen property, terroristic threats and corruption of minors. Later, on January 20, 1982, Burkett was found guilty of the felonies of rape, involuntary deviate sexual intercourse, terroristic threats, and aggravated assault; and of the misdemeanors of unlawful restraint, indecent exposure, terroristic threats, recklessly endangering another person, and indecent assault.

hearing, in a Report and Recommendation to the district court, the United States Magistrate Judge assigned to the matter recommended that exhaustion of state court remedies be excused because of the length of the delay. The magistrate judge then conducted a four-part *Barker v. Wingo* analysis, the test set forth by the United States Supreme Court to evaluate speedy trial claims attributable to delay. 407 U.S. at 517–38, 92 S.Ct. at 2185–2196. He thus examined (1) the length of the delay, (2) the cause of the delay, (3) the defendant's assertion of the right, and (4) the resulting prejudice to the defendant, and concluded that all four factors were to be weighed against the government. Specifically as to prejudice, the magistrate judge found that Burkett suffered prejudice since the length of the delay presupposed "some loss" to the petitioner. *Burkett v. Cunningham,* No. 85–769 (W.D.Pa.1985), Magistrate's Report and Recommendation at 8; App. at 2279. Although positing that an unconstitutional delay of speedy trial rights had occurred, the magistrate judge did not recommend that any affirmative action be taken because "the Court of Common Pleas [of Blair County] has apparently ordered that a hearing [on the post-trial motions] be scheduled." He opined that "it would appear appropriate to withhold any action, to permit the Court of Common Pleas to promptly resolve this matter." App. at 2279–80. Thus, on May 15, 1985, the magistrate judge recommended denial of the writ, conditioned on Judge People's imposing sentence on Burkett within 60 days. The district court adopted the magistrate judge's recommendation and Burkett appealed. We denied Burkett a certificate of probable cause but did so without prejudice to his filing a new petition with the district court if Burkett was not sentenced within the time constraints dictated by the district court.

Indeed, in the interim, on May 8, 1985, Judge Peoples denied Burkett's post-trial motions. His state habeas petition was likewise denied on June 6, 1985. Then, on June 24, 1985, 29 months after his convic-

tion and 38½ months from arrest, Burkett received the maximum sentence permitted for the offenses of which he had been convicted at No. 284—16 to 32 years of imprisonment. No credit was given for time served, although Burkett had remained incarcerated in various county prisons in Western Pennsylvania since April 13, 1982.

On June 24, 1985, Judge Peoples filed an opinion in support of his sentence, but no opinion was filed at that time regarding the denial of the post-trial motions. According to Pennsylvania appellate practice, the opinion explaining the reasons for the denial should have been filed by September 1, 1985, 40 days from the July 23, 1985 filing of the appeal by Burkett. Pa.R.App.P. 1925(a), 1931(a). Judge Peoples filed his opinion on July 16, 1986, in excess of ten months late. The record was transmitted approximately one week later.

While awaiting a written explanation of the denial of his post-trial motions, Burkett filed two federal petitions for relief in August of 1985. Burkett reasserted his arguments concerning the post-conviction delays in all three of his cases and also alleged that the prior federal court order directing Judge Peoples to sentence him within 60 days exposed him to an extremely retaliatory sentence. Counsel was appointed from the Federal Public Defender's Office and an evidentiary hearing was held before a United States Magistrate Judge. On December 24, 1985, the magistrate judge recommended dismissal for want of exhaustion. The district court adopted the magistrate judge's recommendation and Burkett filed an appeal to this court, resulting in *Burkett v. Cunningham,* 826 F.2d 1208 (3d Cir.1987).

In *Burkett I,* we scrutinized the two habeas appeals concerning Burkett's three Blair County convictions to decide whether post-conviction delays warranted granting of the writ. We held generally that the Sixth Amendment guarantee to a speedy trial spans from arrest to sentencing and that due process guarantees against trial delays apply to the direct appeal phase.

The outcome of these cases is documented in our *Burkett I* opinion.

826 F.2d at 1220, 1221. As to the first conviction, since Burkett still was not sentenced for over five and one-half years, we held that this egregious delay violated Burkett's speedy trial right and concluded that discharge was the appropriate remedy. On the second proceeding, which encompassed two separate convictions with a combined delay of over five years, we agreed with the district court that Burkett was not entitled to relief under the speedy trial guarantee of the Constitution but concluded that the delay in processing the state court direct appeal arguably violated due process and remanded this matter to the district court for factual findings on prejudice. *Id.* at 1226–27.[5]

With regard to the convictions at issue here, although we discussed the delay attributable to that action, because Burkett's appeal to the Pennsylvania Superior Court had been decided on January 12, 1987 and his allocatur petition to the Pennsylvania Supreme Court was pending, we affirmed the district court's dismissal of the writ for failure to exhaust state remedies and did not reach the constitutional issues. We stated that

> Burkett's direct appeal now appears to be proceeding normally.... [I]t is not disputed that the case is now before the Pennsylvania Supreme Court. Under these circumstances, we believe that it is appropriate to allow that court, in the first instance, to hear petitioner's claim.

*Id.* at 1218.

Unfortunately, the delay which permeated the sentencing phase of Burkett's drama

continued in the state appellate process. A portion of the trial court record was transmitted to the Superior Court on January 2, 1986, four months late by reference to the Pennsylvania appellate rules. Then, in order to preserve his allegation of ineffectiveness of counsel, Burkett renewed the request for different counsel previously denied by the Blair County Court. The Superior Court granted the request on April 4, 1986, remanding the case to the jurisdiction of Blair County and allowing 30 days for the appointment of new counsel. Counsel was promptly named, but it took Blair County over three months to retransmit the record to the Superior Court. Therefore, it was not until January 12, 1987, 18 months after its filing, that Burkett's appeal was finally denied by the Superior Court.[6] The Pennsylvania Supreme Court denied allocatur on December 28, 1987.

When his allocatur petition was eventually denied on December 28, 1987, almost one year after the Superior Court's affirmance of sentence, Burkett returned to the federal system and requested that his constitutional claims, now having been fully exhausted, be reviewed anew.

Shortly thereafter, on January 23, 1988, Burkett filed a new federal habeas corpus petition raising various challenges to his conviction, including claims of counsel's ineffectiveness as raised in his state court appeal, lack of sufficient evidence, and reassertion of his constitutionally-couched

---

**5.** It is not clear from the record precisely what transpired after remand to the district court. The district court docket entries reveal that on April 13, 1988 an order was entered granting the writ of habeas corpus and Burkett was discharged from custody on this conviction. Also, Burkett testified that as a result of a federal habeas proceeding he was eventually credited for the prison time served post-arrest. App. at 1459. We assume, therefore, that this remedy resulted from the above-mentioned remand proceeding.

**6.** In affirming the judgment of sentence, the Pennsylvania Superior Court disposed of the appeal by ruling on the merits of only four of seven issues raised. The court did not address two issues for failure by Burkett to raise them in post-trial motions. One issue was whether

the trial court had erred by delaying imposition of Burkett's sentence. A third issue was deemed waived for failure to include it in a motion for reconsideration of sentence.

The Superior Court also dismissed Burkett's issue of ineffectiveness of counsel, concluding that no prejudice had been proven as mandated by *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

The Superior Court also concluded that the trial court's grant of continuances to the prosecution under Pa.R.Crim.P. 1100, the sufficiency of the evidence to convict, and the refusal of the trial judge to merge the attempted rape and recklessly endangering charges for the purposes of sentencing, did not constitute reversible error. *Commonwealth v. Burkett,* 364 Pa.Super. 643, 525 A.2d 813 (1987).

delay claims. On December 7, 1988, the magistrate judge issued a Report and Recommendation, suggesting dismissal of Burkett's allegations of ineffective representation by counsel and insufficiency of evidence. The magistrate judge did not address the speedy trial and due process issues, concluding that Burkett's styling of the claim in terms of ineffectiveness of counsel defeated the exhaustion requirement.

In objections filed to the magistrate judge's report, Burkett requested that he be permitted to amend his petition in order to drop the ineffectiveness claim and to reassert the issue as a violation of his constitutional rights, an issue which had been exhausted. The district court adopted the magistrate judge's recommendation and, while not ruling explicitly on the requested amendment, denied Burkett's objections to the magistrate judge's report which included the proposed amendment.

In an unpublished opinion, *Burkett v. Cunningham*, No. 89–3118, (3d Cir. Aug. 7, 1990) [914 F.2d 241 (table)], (*Burkett II*), we found error in the district court's labeling of Burkett's constitutional issues as ineffectiveness of counsel claims and determined that the refusal to permit Burkett to amend his petition to exclude the unexhausted claims was not consistent with a sound exercise of discretion. We concluded that the failure to permit the amendment violated the option provided prisoners by *Rose v. Lundy*, 455 U.S. 509, 520, 102 S.Ct. 1198, 1204, 71 L.Ed.2d 379 (1982), to resubmit the petition excluding the unexhausted claims. It was thus necessary to remand this matter:

> Inasmuch as the district court did not address Burkett's speedy trial and due process claims, we must remand to the court for appropriate findings as to whether the 29 month delay between the conviction and sentencing violated Burkett's speedy trial or due process guarantees, and whether the two year, five month delay in addressing his state court appeal constituted a violation of due process.

*Burkett II*, at 7. We then suggested that the district court evaluate the constitutional claims by application of the four part *Barker v. Wingo* test. We also clarified that although we did not comment on the merits of the other issues raised, in the event that Burkett's petition was dismissed by the district court, Burkett would be entitled to present all exhausted claims in a new request for a certificate of probable cause.

On remand, the magistrate judge conducted an evidentiary hearing on the speedy trial and due process issues. In applying the *Barker v. Wingo* factors, the magistrate judge considered the length of the delay, calculating it as 29 months from the date of conviction to date of sentencing and 18 months from sentencing to decision by the first appellate court of right, the Pennsylvania Superior Court. The magistrate judge further concluded that Burkett satisfied the third factor which evaluates the petitioner's attempts to assert his constitutional rights. As to the second factor, the cause of the delay, the magistrate judge found that Burkett was equally responsible for the time lag—attributable to the number of post-trial petitions and requests for hearings filed by Burkett. Thus, when evaluating the fourth factor of prejudice, the magistrate judge refused to credit any anxiety and distress to Burkett caused by the protracted litigation. The magistrate judge also discounted Burkett's argument that the passage of time resulted in the dimming of witnesses' memories because the prior testimony of the witnesses was a matter of public record.

The magistrate judge thus filed a Report and Recommendation suggesting the denial of habeas relief. The district court adopted the report as its own and entered an order dismissing the writ. On appeal, we granted Burkett's request for a certificate of probable cause.

■ The district court's legal conclusions that Burkett failed to establish a violation of his constitutional rights to a speedy trial or due process are reviewable *de novo*. *Lesko v. Owens*, 881 F.2d 44 (3d Cir.1989), *cert. denied*, 493 U.S. 1036, 110 S.Ct. 759,

**1438**

107 L.Ed.2d 775 (1990). The factual findings underpinning these legal conclusions are reviewed for clear error. *Monachelli v. Warden,* 884 F.2d 749 (3d Cir.1989).

## II.

The Sixth Amendment guarantees a criminal defendant a speedy trial. The Due Process Clause of the Fourteenth Amendment dictates that the states effectuate this constitutional guarantee. *Klopfer v. North Carolina,* 386 U.S. 213, 87 S.Ct. 988, 18 L.Ed.2d 1 (1967).

Until our decision in *Burkett I,* the application of the right to a speedy trial to post-conviction proceedings was not clearly established. There we noted that although the Supreme Court in *Pollard v. United States,* 352 U.S. 354, 77 S.Ct. 481, 1 L.Ed.2d 393 (1957), presumed for purposes of argument "that sentence is part of the trial for purposes of the Sixth Amendment" *id.* at 361, 77 S.Ct. at 485, the Court had not yet specifically addressed the issue. *Burkett,* 826 F.2d at 1220. We then reviewed decisions from our sister courts of appeals which discussed the issue after *Pollard.* Some courts chose to label the post-conviction expansion of the right as verified law, *see Tinghitella v. California,* 718 F.2d 308, 312–13 (9th Cir.1983); *United States v. Howard,* 577 F.2d 269, 270 (5th Cir.1978), while others assumed the legitimacy of the expansion *arguendo. See Perez v. Sullivan,* 793 F.2d 249, 253 (10th Cir.), *cert. denied,* 479 U.S. 936, 107 S.Ct. 413, 93 L.Ed.2d 364 (1986); *United States v. Sherwood,* 435 F.2d 867, 868 (10th Cir.1970), *cert. denied,* 402 U.S. 909, 91 S.Ct. 1381, 28 L.Ed.2d 649 (1971); *United States v. Campisi,* 583 F.2d 692, 694 (3d Cir.1978). In *Burkett I,* after analyzing the jurisprudence in this area, we dispelled the ambiguity and held conclusively that the Sixth Amendment right to a speedy trial applies from arrest through sentencing. *Burkett I,* 826 F.2d at 1220.[7]

With respect to the period of time from sentence through direct appeal, in *Burkett I* we were required to confront the argu-

ment, for the first time, that the Due Process Clause extends procedural safeguards to defendants in appeals as of right. In reaching our conclusion in *Burkett I* that the protections of the Due Process Clause can apply post-conviction, we relied upon the Supreme Court rationale for broad application of the clause's safeguards:

> By deciding that an appeal is so important that it must be available as a matter of right, a state has "made the appeal the final step in the adjudication of guilt or innocence of the individual." *Id.* [*Evitts v. Lucey,* 469 U.S. 387] at 404, 105 S.Ct. [830] at 840 [83 L.Ed.2d 821] [1985] (citing *Griffin* [*v. Illinois* ] 351 U.S. [12] at 18, 76 S.Ct. [585] at 590 [100 L.Ed. 891 (1956) ]). The state itself recognizes that an appeal as of right plays such a crucial role that "the State could not ... decide[ ] the appeal ... arbitrar[il]y" or otherwise deny an appellant "fair procedure." *Evitts,* 469 U.S. at 404, 105 S.Ct. at 840.

*Id.* at 1221.

Having established the possibility that a constitutional deprivation can result from post-conviction delay, we turn to whether Burkett is entitled to habeas relief on these grounds.

## III.

### A. *The Delay in Imposing Sentence*

■ We are to assess four factors in determining whether the constraints imposed by speedy trial and due process rights have been honored: (1) length of the delay, (2) reason for the delay, (3) the defendant's assertion of his right, and (4) prejudice to the defendant. *Barker v. Wingo,* 407 U.S. at 517–38, 92 S.Ct. at 2185–95. The district court's factfindings in the context of these factors are subject to the clearly erroneous standard of review. Our review of the court's application of the law to these facts is plenary.

Although the Supreme Court has not precisely articulated a guideline for applying the factors to delays in the post-conviction

---

7. Of note, "no federal court has held that sentencing is *not* within the protective ambit of the

Sixth Amendment right to a speedy trial." *Perez v. Sullivan,* 793 F.2d 249, 253.

context, a number of courts of appeals, *see United States v. Reese,* 568 F.2d 1246, 1253 (6th Cir.1977); *United States v. Campbell,* 531 F.2d 1333 (5th Cir.1976), *cert. denied,* 434 U.S. 851, 98 S.Ct. 164, 54 L.Ed.2d 121 (1977); *Perez v. Sullivan,* 793 F.2d at 254, including us, *see United States v. Campisi,* 583 F.2d 692, 694 (3d Cir.1978), and *Burkett I,* 826 F.2d at 1220, have applied the four-part *Barker v. Wingo* standard of evaluation in such situations.

By way of general guidance, concerning the four-part test, the Court stated that:

We regard none of the four factors identified above as either a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial. Rather, they are related factors and must be considered together with such other circumstances as may be relevant. In sum, these factors have no talismanic qualities; courts must still engage in a difficult and sensitive balancing process.

*Barker,* 407 U.S. at 533, 92 S.Ct. at 2193.

With this concept of a "fluid balancing test" in mind, *see Wells v. Petsock,* 941 F.2d 253, 256 (3d Cir.1991), we review the facts concerning delay as found by the district court.

### 1. Length of the Delay

 The mathematics involved in calculation of the delay in this case are undisputed—38½ months passed from arrest to sentencing, 29 of these dating from the guilty verdict.[8]

The district court did not render a specific legal conclusion concerning whether the 29–month delay was sufficient to invoke the presumption of a speedy trial violation. Because the court continued in its *Barker*

*v. Wingo* analysis, however, we can presume that it concluded that Burkett satisfied this threshold requirement.[9]

We agree that Burkett did satisfy the first prong, even though the delay he experienced was not as egregious as others reported, *see, e.g., Burkett I,* 826 F.2d at 1210 (five and one-half years from conviction, Burkett not sentenced); *United States v. Campbell,* 531 F.2d at 1333 (six year delay); *Juarez–Casares v. United States,* 496 F.2d 190, 192 (5th Cir.1974) (prisoner discharged after 31 month delay); *Hooper v. Cunningham,* 1985 W.L. 390 at *3 (Blair County prisoner unsentenced for 37 months discharged from custody). Despite the impossibility of imposing a bright line "how long is too long" standard, *Barker,* 407 U.S. at 521, 92 S.Ct. at 2187, we are convinced that the delay of 29 months from conviction to sentence invites inquiry into the three remaining *Barker v. Wingo* factors.

### 2. Reason for the Delay

In assessing the number two prong, the cause of the delay, the district court made reference to the congestion of the court calendar in the Blair County Court. While correctly noting that a crowded docket is not afforded substantial weight in considering speedy trial claims, the district court failed to implement the Supreme Court's directive in *Barker* that the ultimate responsibility of delay caused by overcrowded courts rests with the government. 407 U.S. at 531, 92 S.Ct. at 2192. We emphasized this responsibility in *Burkett I:*

The reason for the additional delay— crowded court calendars and the court

**8.** Burkett argues that the district court erred in computing the delay to be only 29 months, which did not include the additional nine and one-half months from arrest to conviction. Although we agree that this additional time would be significant in the weight to be charged against the government for the length of delay, in fairness to the district court, our remand order explicitly directed the court to evaluate whether "the 29 month delay between conviction and sentencing violated Burkett's speedy trial or due process guarantees...." *Burkett II,* No. 89–3118 at 7.

**9.** When Burkett's original petition, which included this claim, was heard by the same magistrate judge, the fact that Burkett had not been sentenced on any of the charges for over three and one-half years was sufficient for the court to decide not only that the length of delay presumed a denial of rights, but also that "it would be reasonable to conclude that the delay by Blair County courts has caused some loss to [Burkett]." *Burkett v. Cunningham,* No. 85–769 (W.D.Pa.1985), Magistrate's Report and Recommendation at 8; App. at 2279.

reporter's delay in filing transcripts—must be weighed against the government rather than Burkett.

826 F.2d at 1223.[10]

In addition to the general maxim that court congestion is the state's responsibility, the record evidence here affirmatively indicates that the failure to schedule a hearing on Burkett's post-trial motions was administrative in nature. At the evidentiary hearing, the Blair County Court Administrator testified that he had no explanation as to why a briefing schedule had not been established according to the procedure normally followed by the Blair County Court or a hearing set on Burkett's post-trial motions.[11] The Court Administrator further testified that during this time he was alphabetically updating criminal defendants' post-trial motions in preparation for implementation of a computer system. Although he represented that he was currently up to the letter "D," he could not explain why "Burkett's motions, beginning with the letter "B", had yet to be scheduled.

Judge Peoples, the trial judge, also testified concerning the status of the court's calendar. In explaining the delay in processing Burkett's post-trial motions, Judge Peoples testified that he could not specifically recollect why Burkett's post-trial motions were delayed, but hypothesized that courtroom demands on his time might be the cause.

■ As this evidence indicates, the delay caused by the backlog of cases in Blair County cannot be classified as justifiable. While not the type of purposeful activity proscribed in *Pollard*, 352 U.S. at 361, 77 S.Ct. at 485, the delay attributable to the congested calendar falls into a non-intentional, but negligent area of administrative overload for which the government must assume responsibility. Thus the district court erred as a matter of law in not assessing the court's crowded dockets against the government.

It is true that Burkett himself added some volume to the dockets in the period between his conviction and sentence. In reviewing Burkett's post-conviction activity, the district court allocated to him a portion of responsibility for the delay:

> Thus it becomes apparent that the great deal of delay in both the trial and the appellate court was occasioned by motions submitted by or on behalf of the petitioner which had to be directed to the court for disposition. These repeated motions added a considerable amount to the delay and disposition by both those courts.

*Burkett v. Cunningham*, No. 88–1397, Magistrate's Supplemental Report and Recommendation at 10; App. at 1578. Indeed, Burkett vigorously pursued his challenge to the jury's verdicts of guilty by filing a timely motion for a new trial and/or arrest of judgment. Then, 13 months later, on March 12, 1984, at Burkett's request, counsel filed a petition for writ of habeas corpus challenging Burkett's custody on the basis that his speedy trial and due process rights had been violated because of the delay in disposing of Burkett's post-trial motions and in the imposition of his sentence. After the filing of the petition, beginning on March 28, 1984 Burkett began correspondence with his attorney inquiring as to the status of the habeas petition. When Burkett perceived one response from his attorney as being sarcastic in nature, Burkett determined that his counsel was not taking the appropriate steps in his matters and requested him to withdraw.

---

**10.** We note, too, that in the previous *Burkett* district court decision dealing with Burkett's Blair County convictions, *Burkett v. Cunningham*, No. 85–769 (W.D.Pa.1985), Magistrate's Report and Recommendation at 6; App. at 2277, the district court weighed the overcrowded court calendar against the government.

**11.** Although the dissent would penalize Burkett at this juncture for the 23–month period between the filing of Burkett's post-trial motions and their supporting brief, the timing of the brief's filing was clearly not within Burkett's arena of responsibility. It is the Blair County Court, through its administrative arm, which shoulders the burden of scheduling these matters. *See* Letter Brief of David Gorman, Blair County Assistant District Attorney, dated August 27, 1991, explaining that scheduling of these matters was ordinarily accomplished by letter from the Court Administrator, although no such letter is included in the record of this case.

In June of 1984 Burkett also initiated communication with Judge Peoples. Burkett complained of his counsel's lack of effectiveness and requested that the court appoint new counsel. Judge Peoples advised Burkett that he would discuss the matter of scheduling a hearing with the Court Administrator. He also suggested that Burkett present his complaints about his attorney to the judge presiding over the habeas hearing. Burkett again wrote to Judge Peoples on July 25, 1984 requesting appointment of new counsel to present Burkett's claims against his trial counsel at the habeas corpus hearing. It was then that counsel advised Burkett that he would likewise request that new counsel be appointed and filed a petition to withdraw as counsel. Judge Brumbaugh conducted a hearing on this motion on August 6, 1984 and denied the motion to withdraw pending disposition of the post-trial motions. Burkett continued correspondence with his attorney, the Court Administrator and the trial judge. Dissatisfied with the responses, Burkett then filed, on September 6, 1984, a *pro se* application for evidentiary hearing by alleging ineffectiveness of counsel and for appointment of new counsel. Judge Brumbaugh held a hearing on October 11, 1984, at the conclusion of which he indicated that a ruling would be forthcoming on the habeas corpus and bond reduction by the end of the week.

Burkett also requested that his attorney file a petition for a writ of habeas corpus in the federal courts. When counsel failed to do so, Burkett filed a *pro se* petition for writ of mandamus in February of 1985 seeking to compel the court to direct his attorney to file for federal habeas relief.

A hearing was held by Judge Peoples on April 1, 1985, on Burkett's *pro se* motion for new counsel and for an evidentiary hearing concerning ineffectiveness. Burkett was denied appointment of new counsel on April 2, 1985.

Certainly Burkett's aggressive petitioning of the courts required additional paperwork, scheduling of hearings and courtroom time. Yet, by the filing and argument of these motions, which the district court weighed *against* him, Burkett sought merely to compel the Blair County Court to act upon his post-trial motions, or to obtain counsel who would either petition the court to act, to preserve his speedy trial rights, or to secure his appeal rights. It was not unreasonable for Burkett to move for new counsel in view of his perception that his counsel was not receptive to his pleas to have his post-trial motions heard. In addition, we are concerned that a hearing on Burkett's initial state habeas petition was not scheduled for *almost seven months* after its filing. Therefore, rather than the habeas filing demonstrating that *Burkett* contributed to the delay, we view Blair County's delay in handling this serious matter as indicative instead of the general inability of that county's court to process its criminal dockets in a timely fashion. Accordingly, the cause of the delay here, too, is weighed against the government.

### 3. Defendant's Assertion of the Right

The district court acknowledged that the petitioner urged the speedy disposition of his case. As the chronology stated above amply demonstrates, Burkett's tenacity in pursuing his claims heavily weighs this factor in his favor.

### 4. Prejudice

Unfortunately, the district court did not make any specific findings as to the prejudice which Burkett may have suffered because of the delay. Instead the court reasoned that because Burkett caused some of the delay in the state court's disposition of his case, any prejudice which Burkett may have experienced would not support the granting of relief. Since we have decided that the court's attribution of delay to Burkett was clearly erroneous, we also find that the court's failure to consider the prejudice factor wanting. Clearly, the testimony on behalf of Burkett was orchestrated to demonstrate that Burkett suffered prejudice while awaiting sentencing. We must exercise our power of plenary review to determine if the testimony establishes sufficient qualitative prejudice to weigh this factor in Burkett's favor.

In *Burkett I* we acknowledged that while all four *Barker v. Wingo* factors are to be balanced in light of the facts and circumstances of any case, "the *Barker* prejudice factor did not run fully concurrently when examining delays in sentencing and delays in initiating appellate review." *Burkett I,* 826 F.2d at 1222.[12]

In *Moore v. Arizona,* 414 U.S. 25, 94 S.Ct. 188, 38 L.Ed.2d 183 (1973), the Supreme Court stated that the *Barker v. Wingo* factors assume a different (presumably lesser) stature where the defendant is incarcerated after conviction, but explicitly rejected the notion that prejudice is confined to possible impairment of the defense at trial. Instead the Court cautioned that the possible impact impending charges may have on prospects for parole and meaningful rehabilitation should not be overlooked. *Moore,* 414 U.S. at 27, 94 S.Ct. at 190.

The Supreme Court has discussed another specific incident which may invoke post-conviction prejudice. In *Strunk v. United States,* 412 U.S. 434, 93 S.Ct. 2260, 37 L.Ed.2d 56 (1973), *quoting Smith v. Hooey,* 393 U.S. 374, 378, 89 S.Ct. 575, 577, 21 L.Ed.2d 607 (1969), the Court stated:

> [T]he possibility that a defendant already in prison might receive a sentence at least partially concurrent with the one he is serving may be forever lost if trial of the pending charge is postponed.

*Strunk,* 412 U.S. at 437–38, 93 S.Ct. at 2262–63.

Relying on *Moore, Strunk* and *Smith* in applying the prejudice prong of the *Barker v. Wingo* analysis to post-conviction delays, our sister courts of appeals have identified three traditional interests protected by the speedy trial right: "(1) prevention of oppressive incarceration; (2) minimization of anxiety and concern of the accused; and (3)

limitation of the possibility that a defense might be impaired," *Barker,* 407 U.S. at 532, 92 S.Ct. at 2193, and have adapted them to the relevant timeframe, i.e., awaiting sentence or disposition on appeal. For example, oppressive pre-trial incarceration is not a concern, but instead, focus is directed towards the defendant's time awaiting sentence, the anxiety associated with not knowing the extent of time to be served, and the hindering of a defense on retrial. *See Perez v. Sullivan,* 793 F.2d at 256–57.

The difficulty in establishing prejudice in the post-conviction setting was addressed by the Court of Appeals for the Tenth Circuit in *Perez.* Although acknowledging the Supreme Court holding in *Moore v. Arizona,* 414 U.S. 25, 26, 94 S.Ct. 188, 189, 38 L.Ed.2d 183 (1973), that demonstrating prejudice is not always a condition precedent to finding a Sixth Amendment violation, the court of appeals opined that, post-conviction:

> [I]t might be said that once a defendant has been convicted it would be the rarest of circumstances in which a right to a speedy trial could be infringed without a showing of prejudice. Moreover, the necessity of showing substantial prejudice would dominate the four part balancing test. This is because of the traditional interest the speedy trial guarantee is designed to protect: (1) prevention of oppressive pretrial incarceration; (2) minimizing anxiety and concern of the accused; and (3) limiting the possibility that the defense would be impaired.... Most of these interests diminish or disappear altogether once there has been a conviction.

793 F.2d at 256.[13] Obviously, as noted in *Perez,* the change in the status from "ac-

<hr>

**12.** Although the majority in *Burkett I* duly acknowledged the law concerning adoption of the prejudice factor post-conviction, when applying it to the facts of that case, under a law of the case rationale, it relied upon the district court's finding that the delay alone had caused Burkett prejudice. This approach was strongly criticized in a concurring opinion authored by Judge Garth. Here we do not have a district court finding of prejudice in favor of Burkett, so we need not determine whether such a general-

ized finding would suffice, under law of the case, to satisfy the prejudice factor.

**13.** The issue of whether actual prejudice must be demonstrated to establish a speedy trial claim is presently before the Supreme Court in *Doggett v. United States,* — U.S. —, 111 S.Ct. 1070, 112 L.Ed.2d 1176 (1991) (order granting certiorari ), *reh'g granted,* — U.S. —, 112 S.Ct. 631, 116 L.Ed.2d 601 (1991). *See United States v. Doggett,* 906 F.2d 573 (11th Cir.1990) (failure

cused and presumed innocent" to "guilty and awaiting sentence" is a significant alteration which must be taken into account in the balancing process. 793 F.2d at 254. As Judge Garth noted in his concurring opinion in *Burkett I:* "Post-conviction there is less fear that an innocent individual is being improperly subjected to deprivation inherent in incarceration. In effect, post-conviction the individual knows that punishment is imminent, it is uncertain only as to degree." 826 F.2d at 1231 (Garth, J., concurring). Nonetheless, this does not diminish in any way the balancing test which must be employed in evaluating such claims.

■ With this standard in mind, we evaluate Burkett's allegations of prejudice, beginning with his claim of exposure to oppressive pre-sentence incarceration. First, Burkett complained that because he could not secure the onerous $100,000 bond set, he was denied the opportunity to demonstrate good behavior while released. We find that this allegation is too speculative for consideration.

■ Second, Burkett argued that the trial court's failure to sentence him impeded his ability to apply for commutation of sentence, governor's pardon, or reconsideration, since no commutation can be considered until all appeals have been exhausted. Though uncontradicted, these are not the quality of losses sufficiently substantial to justify relief from custody.

Third, Burkett contends that, in computing his sentence, Judge Peoples considered a subsequent arrest for perjury detailed in Burkett's presentence report. This averment, if proven, would suffice to show prejudice. *See Juarez–Casares v. United States,* 496 F.2d 190, 193 (5th Cir.1974) (prejudice demonstrated by sentencing court's considering subsequent conviction).

It is impossible, however, to probe the truth of Burkett's accusation in this regard. Judge Peoples testified that he could not remember specifically whether or not the perjury charge was included in the pre-sentence report, but he stated that he would not consider an arrest, without a conviction, when imposing sentence. Therefore, without any direct evidence which counters Judge Peoples' testimony, we cannot credit Burkett's contention that his subsequent arrest impacted the sentence received.

Burkett next contends that he was unable to avail himself of institutional programs, critical to his rehabilitation, available through the state but not the county penal system, namely, alcohol and sex offender programs in which he was eventually able to participate when incarcerated in the state prison. Calculating from the date of his arrest, the three and one-half years of incarceration in the county system was characterized by Burkett as "dead time." Burkett also referred to the loss of time in which he could have been afforded visiting privileges outside the walls of the prison. Such visitation rights are available through the state system to a particular classification of inmates.

We do find merit in Burkett's detailing of prejudice here. Although it is not the norm for a prisoner to advocate the advantages of the state penal system before us, we are willing to credit Burkett's assertions that access to rehabilitative programs and the opportunity for more liberal visitation privileges are an appealing and legitimately valid alternative to the limbo he experienced in the county system.

As to his concern that the certainty of a sentence imposed would minimize anxiety and distress, Burkett detailed his inability to eat and sleep and how, on occasion, he

of a defendant to show prejudice precludes speedy trial claim even though other factors were either neutral or weighed against government).

 The questions presented to the Court for review are:

 1) In a speedy trial analysis in which three of the four *Barker* factors weigh in favor of the government, is there a mandatory require-

ment to demonstrate actual prejudice before a defendant can prevail on an allegation that a speedy trial right has been violated?

 2) Has *Moore v. Arizona,* 414 U.S. 25, 94 S.Ct. 188, 38 L.Ed.2d 183 (1973), which holds that an affirmative demonstration of prejudice to defense at trial is not required, been reversed? 906 F.2d 573.

was reduced to tears by frustration caused by the delay in disposition of his post-trial motions and sentencing. He mentioned the loss of his fiancee who, he claimed, ended their relationship because of the uncertainty of the length of his incarceration.

Whether this imprisonment angst rises above the level of anxiety indigenous to any term of incarceration is difficult to discern. In some instances the distress associated with delay in criminal proceedings has been medically verified. In *United States v. Dreyer*, 533 F.2d 112 (3d Cir. 1976), a defendant experienced a 29 month delay between indictment and trial. During this time she experienced a severe mental disturbance which, despite psychiatric treatment, culminated in a suicide attempt. In *Dreyer*, we found that the anxiety equated to sufficient prejudice to satisfy the fourth *Barker v. Wingo* factor.

In a later and less factually dramatic case, *Government of the Virgin Islands v. Pemberton*, 813 F.2d 626 (3d Cir.1987), we acknowledged that under *Moore v. Arizona*, 414 U.S. at 27, 94 S.Ct. at 190, *quoting Barker*, 407 U.S. at 537, 92 S.Ct. at 2195 (White, J., concurring), the fact that there has been disruption to a defendant's employment, his financial resources affected and the general strain and anxiety put upon family and friends constituted prejudice which must be considered in ascertaining whether there has been a speedy trial violation. We balanced this, on the other hand, with the recognition that a certain amount of anxiety in the form of personal prejudice to the accused is inevitable in a criminal case. *Pemberton*, 813 F.2d at 629. Relying upon our decision in *Government of the Virgin Islands v. Burmingham*, 788 F.2d 933, 937 (3d Cir.1986), that an 18 month delay between indictment and sentencing did not, under *Barker*, require us to grant relief, we denied Pemberton's constitutional claim for failure to produce evidence of a specific psychological disorder resulting from the anxiety of incarceration. *Pemberton*, 813 F.2d at 629–30.

We recognize a marked difference in the *Pemberton* case and the one before us today. Although we compared the psychological distress in *Pemberton* unfavorably to the type of specific disorder which satisfied the prejudice factor in *Dreyer*, we faulted Pemberton because, despite his allegations of acute anxiety, he made no inquiry of the government or of the court as to the status of his criminal proceedings. We certainly cannot penalize Burkett, as we did the petitioner in *Pemberton*, for a lack of interest in inquiring as to the status of his case.

Likewise we recognize that Burkett's anxiety does not rise to the level of mental disorder detailed in *Dreyer*, but it is uncontested that Burkett suffered lack of sleep, loss of appetite, loss of companionship and emotional stress associated with his inability to determine the length of his incarceration. This uncontested evidence gives credence to Burkett's contention that the delay between conviction and sentencing caused him to suffer emotional distress, complete with physical manifestations. Although we hesitate to conclude that this evidence of anxiety in and of itself would support relief under *Barker* and its progeny, it does function to tip the scale slightly in Burkett's favor in evaluating his speedy trial claim.

Finally, regarding the possibility of an impaired defense on retrial, Burkett contends that the passage of time would make it more difficult for him to refresh the memory of witnesses or to elaborate upon exculpatory evidence in the event of a retrial. Certainly the possibility of the dulling of memories works against the government as well. As stated by the Supreme Court in *United States v. Loud Hawk*, 474 U.S. 302, 315, 106 S.Ct. 648, 656, 88 L.Ed.2d 640 (1986):

> [D]elay is a two-edged sword. It is the Government that bears the burden of proving its case beyond a reasonable doubt. The passage of time may make it difficult or impossible for the Government to carry out this burden.

*Id.* at 315, 106 S.Ct. at 656. This is not critical here because in *Moore v. Arizona*, 414 U.S. at 26–27, 94 S.Ct. at 189–190, the Court explicitly rejected a reading of *Barker* to confine prejudice to impairment of the

defense and, instead, recognized that an accused is also "disadvantaged by restraints on his liberty and by living under a cloud of anxiety, suspicion and often hostility," 407 U.S. at 533, 92 S.Ct. at 2193.

Although Burkett's status changed from "accused" to "convicted," and his allegations of prejudice chiefly concern delays subsequent to conviction, we conclude that the speedy trial guarantee shield against personal prejudice, *see Strunk v. United States,* 412 U.S. at 439, 93 S.Ct. at 2263, has been significantly damaged by the delay between Burkett's conviction and sentence. Nonetheless, we do not rest our decision to grant the writ solely on the demonstration of prejudice to this point. It is not until we detail the subsequent delay, between sentencing and appeal disposition, and evaluate its cumulative impact, that we conclude that Burkett has suffered the deprivation of a constitutional right.

### B. *The Delay in Resolving the Direct Appeal*

#### 1. Length of the Delay

■ As with the sentencing computation, there is no dispute that the passage of time from notice of appeal to affirmance of judgment by the Pennsylvania Superior Court was 18 months.

#### 2. Reason for the Delay

Once again, the district court erroneously attributed a portion of the cause for delay to Burkett. The procedural history begins with the notice of appeal filed by Burkett on July 23, 1985. Burkett's brief was filed on February 10, 1986. After Burkett filed a disciplinary action against his counsel, a motion to withdraw was granted on April 4, 1986, and new counsel was appointed on April 9, 1986.

Despite the passage of all of this time, the trial court's opinion denying the post-trial motions was not filed until July 16, 1986—*one full year* after the notice of appeal. As an explanation, Judge Peoples stated that he was not authorized to employ a law clerk until 1984. He also testified that in the years 1983 through 1986 he and his fellow judges were constantly in the courtroom and necessarily compelled to confine their opinion-writing time to nights and weekends. The Court Administrator, however, contradicted this testimony. According to his recollection, in 1985 he scheduled one week per month per judge for opinion-writing time. Also, by the Court Administrator's records, Judge Peoples was not in the courtroom as represented. In fact, neither trials nor court hearings were scheduled in July and August when the Blair County Courthouse was closed.

After the opinion was filed, Burkett filed a supplemental brief on August 26, 1986. Burkett then moved for appointment of new counsel, which was denied on September 23, 1986. After the appellee's brief was filed, Burkett filed another motion for new counsel which was denied December 15, 1986. Finally, the judgment of sentence was affirmed by the Superior Court on January 12, 1987.

We glean from this history that while Burkett's troubles with his attorneys may have added a month or two to the appellate process, the delay in the appeal was directly caused by the trial judge's failure to file an opinion, in derogation of the Pennsylvania Rules of Appellate Procedure, for one year. Thus, the district court's attribution of delay to Burkett was incorrect and the cause for delay must be charged, instead, against the government.

#### 3. Defendant's Assertion of the Right

There is no contention that Burkett did not doggedly pursue his appellate claims. Thus this factor will weigh in his favor.

#### 4. Prejudice

Our analysis of those elements which constitute prejudice caused by delay in the appellate process is not distinguishable from our discussion in the context of sentencing. The identical factors of oppressive incarceration, anxiety and distress, and possible impact on the defense at retrial are considered. We add here the additional facts attested to by Burkett concerning the prejudice suffered: the continued inability

to participate in rehabilitative programs, the anxiety of not knowing when his appeal would be decided and the further passage of time affecting his ability to reconstruct his defense. It is not, however, a qualitative difference but the increased *quantity* of prejudice which concerns us. In our analysis of the delay in sentencing, we held that the constitutional protection of the Sixth Amendment had been impacted. We conclude now that that injury has been intensified by the appellate delay in violation of the Due Process Clause. Although one phase of the delay—from conviction through sentencing—invoked Sixth Amendment protection and the later appellate stage involves due process considerations, it makes little substantive difference. The label we attach to the constitutional deprivation—though important—is not as critical as the establishment that indeed such rights have been violated.

Burkett's loss incurred due to the post-conviction delay did not take a different form just because the two phases of the delay were protected by different constitutional guarantees. Although our legal authority for granting relief due to a loss of these rights is dictated by the clause which establishes the right, in our prior cases analyzing the prejudice factor, we do not discern a difference whether we discuss speedy trial or due process. Under either constitutional amendment, we analyze whether, after conducting the sensitive balancing test under *Barker v. Wingo*, the scales tip in favor of the petitioner or of the government.

Here, the length and cause for the delay weigh decidedly against the government and in favor of Burkett. Burkett's assertion of his right strongly tips the scale to Burkett's favor. Finally, as to the prejudice factor, while Burkett's evidence is less than overwhelming in this regard, we are satisfied that he has demonstrated genuine loss—cumulative in nature—because of the delays in the post-conviction processing of his case at the trial court level and through the appellate process. Particularly in light of the heavy weighing of the other three factors against the government, we con-clude that Burkett is entitled to habeas relief under the *Barker v. Wingo* test.

## IV.

■ We turn now to the question of relief. Because his constitutional rights have been violated, Burkett asks us to grant his writ and release him forthwith. We must determine if this drastic remedy is appropriate or whether we should attempt to fashion alternate relief.

Our right to "craft" a remedy is granted as a statutory matter. Under 28 U.S.C. § 2241(a) (1948), a "[w]rit of habeas corpus may be granted by the Supreme Court, any justice thereof, the district courts and any circuit judge...." Under 28 U.S.C. § 2243, "[t]he court shall summarily hear and determine the facts, and dispose of the matter as law and justice require." Thus the fashioning of relief is not confined to the district court.

Caselaw precedents, too, support our authority to construct an appropriate remedy. In *Strunk v. United States*, 412 U.S. at 437–38, 93 S.Ct. at 2262–63, the Court reviewed a habeas remedy molded by the Court of Appeals for the Seventh Circuit to compensate for a Sixth Amendment delay. The Court took issue with the Court of Appeals' decision to credit the defendant with the time elapsed between the return of the indictment and the date of arraignment because it did not compensate for the particular prejudice suffered. The Court of Appeals' power to fashion the remedy, however, was not disputed.

A later opinion by the Supreme Court reinforces our authority to grant relief. In *Hilton v. Braunskill*, 481 U.S. 770, 107 S.Ct. 2113, 95 L.Ed.2d 724 (1987), the Court concluded:

> We think it would make little sense if this broad discretion allowed in fashioning the judgment granting relief to a habeas petitioner were to evaporate suddenly when either the district court *or the court of appeals* turns to consideration of whether the judgment granting habeas relief should be stayed pending appeal.

*Id.* at 775, 107 S.Ct. at 2118 (emphasis added).[14]

Balancing the authority granted by statute and as interpreted by caselaw to dispose of the writ in a just manner, against the general prohibition to act as a factfinder, we evaluate Burkett's claim in order to fashion relief designed to rectify the prejudice of the violation. *Burkett I,* 826 F.2d at 1220, *citing Braden v. 30th Judicial Circuit Court of Kentucky,* 410 U.S. 484, 486, 93 S.Ct. 1123, 1125, 35 L.Ed.2d 443 (1973).

In *Burkett I,* we held that no relief short of discharge could fully remedy violation of Burkett's right to a speedy trial and due process where Burkett still had not been sentenced five years after conviction. 826 F.2d at 1226. In *Burkett I,* however, the state court continued to violate the federal court order that petitioner be sentenced, and, also, the state's attorney conceded that discharge was the appropriate remedy.

Here, the relief is more difficult to fashion. Because the district court did not engage in explicit factfinding on the issue of prejudice, we were required to exercise our de novo review powers over the testimony presented. Our activity in this regard is not to be construed as a broadening of our review authority over matters of fact as here, we were not compelled to find facts, per se; rather, we determined that the *uncontradicted* facts legally demonstrated prejudice sufficient to justify granting of the writ. We concluded that the bulk of prejudice occurred here because the "benefits" of incarceration in a state institution were denied to Burkett and because

Burkett was able to detail anxiety related to the processing of his case post-conviction. We recognize that the Court of Appeals for the Tenth Circuit held that in the context of post-conviction delay, these considerations do not warrant discharge as a matter of law, *see Perez,* 793 F.2d at 257 (anxiety of accused not equated for constitutional purposes with anxiety suffered by one convicted, in jail, unquestionably going to serve a sentence, and only waiting to learn how long sentence will be). We are thus challenged to fashion relief in such a way as to compensate Burkett for the particular harm he has suffered.

We have characterized the prejudice suffered by Burkett as that amount of time spent in various county prisons, from conviction to sentencing, without access to rehabilitative and support systems provided by the state court system, the anxiety ensuing from the uncertainty surrounding the delayed disposition of his case and Burkett's inability for effective contact with his family and friends. Thus we conclude that an appropriate remedy here is to reduce Burkett's sentence by the amount of time he spent in various county facilities after conviction and before sentencing, sentencing constituting that point at which the state normally assumes custody of a convicted felon. We calculate this time generally as 29 months.

In addition, Burkett must be credited with the ten-month period of delay in the processing of his direct appeal caused by the trial court's untimely opinion in support of its denial of Burkett's post-trial motions. We will not credit Burkett for the entire

---

**14.** The designing of relief by the courts of appeals has been criticized when there is no factfinding on prejudice by the district court. Indeed, the prior release of Burkett caused Judge Garth to express his displeasure in *Burkett I:*

> The majority appears to believe that when faced with a substantial delay in an individual's speedy trial rights, it is appropriate for this court to address unresolved factual issues concerning both prejudice and the proper remedy for any prejudice that is found. In my view, by so holding in this case, the majority has usurped the district court's traditional role of fact-finder. *See United States v. Campbell,* 531 F.2d 1333, 1336 (5th Cir.1976), *cert. denied,* 434 U.S. 851, 98 S.Ct. 164, 54 L.Ed.2d

121 (1977) (where no explicit finding of prejudice has been made, remand to district court is appropriate). Similarly, once prejudice has been found, it is the district court which should decide what remedial action is required.

826 F.2d at 1223 (Garth, J., concurring).

We note that our willingness to fashion relief here is not to be construed as an unwarranted intrusion into the customary domain of the district court, but is motivated instead by the chronic delay already experienced by Burkett. We are compelled, therefore, to choose the most expedient avenue available to correct the constitutional injury suffered by the petitioner.

period during which his appeal was pending, as the record supports that his case was handled efficiently by the Pennsylvania Superior Court. We are acutely aware of the imprecision inherent in this relief, but we realize that compensating for a constitutional deprivation is not an exact science. We are convinced that effectuation of this remedy will rectify the prejudice suffered.

### V.

In the petition originally filed in this matter, Burkett raised a number of issues separate from his speedy trial and due process claims. When we, in *Burkett II*, remanded the matter to the district court, in an amendment to our opinion we permitted Burkett to raise these additional issues if dissatisfied with the disposition in the district court.

Presently, Burkett has identified three allegations of error which he requests us to review. First, Burkett asserts that his counsel was ineffective for failing to file a motion to suppress suggestive identification evidence. Burkett had argued that the victim's identification of him at the preliminary hearing was tainted because outside of his defense counsel's presence, a police officer escorted the victim over to Burkett, who was handcuffed, and asked her if Burkett was the perpetrator. Burkett's primary complaint is that because there was no hearing on this alleged out-of-court suggestive confrontation between the victim and himself, the district court did not have sufficient facts to evaluate this claim.

 A pretrial identification procedure violates due process, and requires exclusion of the testimony based on that procedure, if it is "so impermissibly suggestive as to give rise to a very substantial likelihood of misidentification." *Simmons v. United States*, 390 U.S. 377, 384, 88

S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968). The general inquiry is whether the procedure was unnecessarily suggestive, and if so, whether its corrupting influence outweighs the reliability of the identification testimony. *Manson v. Brathwaite*, 432 U.S. 98, 114, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140 (1977); *see also Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972) (factors for determining reliability of identification testimony). Here the victim had a face-to-face confrontation with the perpetrator in her house lasting approximately one-half hour.[15] This independent basis for the victim's identification of Burkett is of such sufficient strength that any corrupting influence from the preliminary hearing episode cannot be said to outweigh the reliability of her identification testimony under the *Manson* standard.

 Burkett also contends that counsel was ineffective for failure to file a motion to suppress identification testimony based upon the victim's viewing of a photographic display. Specifically, Burkett argues that the display was highly suggestive because it simply consisted of two photographs of Burkett, and no photographs of anyone else. Nonetheless, even assuming *arguendo* that the photograph identification procedure employed was unnecessarily suggestive, the tainted influence could not have been so great as to outweigh the victim's identification testimony resulting from her observation of the perpetrator at close range for a prolonged period of time during the commission of the crime.

It is true that no evidentiary hearing occurred before the district court, however, the court had available the trial transcript in rendering its conclusion and we find no error in its decision on this issue.

Burkett next argues that there was insufficient evidence to prove beyond a reasonable doubt that he entered the victim's

---

**15.** These findings emanate from the opinions of the Court of Common Pleas on post-verdict motions and the Superior Court's affirmance of the judgment of sentence (finding that the victim had a prolonged encounter with the perpetrator in a well-lit house). State court findings of fact are subject to a presumption of correctness under 28 U.S.C. § 2254(d). *Sullivan v. Cuyler*, 723

F.2d 1077, 1084 (3d Cir.1983). To the extent that Burkett contests the lack of an evidentiary hearing, he has not established that the state factfinding was faulty, that the findings are not fairly supported by the record or that any other exceptions to the presumption of correctness apply. *See Townsend v. Sain*, 372 U.S. 293, 312, 83 S.Ct. 745, 756, 9 L.Ed.2d 770 (1963).

dwelling with the specific intent to commit rape, thus rendering this conviction unsupported by the evidence. Here, the district court correctly concluded from the fact that the perpetrator described sexual acts which the victim was to perform, wielded a knife, and unzipped his pants, that a reasonable jury could infer that he intended to commit a rape.

Finally, Burkett raises a completely unmeritorious claim that there was inadequate evidence to convict him of recklessly endangering another person. The district court properly noted that the jury heard testimony that Burkett brandished a knife and threatened to slit the throat of the victim and that this evidence was sufficient to justify conviction on this offense.

## VI.

For the reasons stated above, we will reverse the order of the district court and will remand the matter to the district court to grant the writ by reducing Burkett's sentence by the 39 months of delay chargeable to the Blair County Court.

ALITO, Circuit Judge, dissenting.

1. This habeas corpus appeal is the latest chapter in a long story. In 1981 and 1982, the petitioner, Wayne Paul Burkett, was charged in the Court of Common Pleas of Blair County, Pennsylvania, with three separate sets of serious criminal offenses. First, in February 1981, Burkett was charged with two rapes, two burglaries, and numerous other crimes. In November 1981, a jury found him guilty of some of the charges, including both burglaries. *Burkett v. Cunningham*, 826 F.2d 1208, 1211 & nn. 1, 3–5 (3d Cir.1987) ("*Burkett I*"). Burkett was never sentenced for those offenses, however, and therefore in *Burkett I* this court ordered his release. *Id.* at 1214, 1225–26.

Six days after Burkett's first arrest in February 1981, he was arrested again and charged with a second set of offenses, including rape and aggravated assault. In January 1982, he was found guilty on all counts. 826 F.2d at 1211 & n. 2. He was not sentenced, however, until after he had filed a federal habeas petition and the district court had entered an order that, in effect, granted the writ unless Burkett was sentenced within a specified period. *Id.* at 1213 & n. 10. In July 1985, Burkett was sentenced as an habitual offender to imprisonment for 22 to 44 years (*id.* at 1213), but as a result of delay in disposing of his direct appeal, this court in *Burkett I* remanded for factfinding (*id.* at 1227) that eventually resulted in his discharge pursuant to another federal writ. Maj. at 1436 n. 5.

In April 1982, while on bail pending sentencing for the second set of charges, Burkett was arrested a third time and charged with attempted rape, burglary, and other crimes. 826 F.2d at 1211–12 & n. 6. He was convicted in January 1983 and sentenced in June 1985 to imprisonment for 16 to 32 years. *Id.* at 1213. The present appeal concerns this third set of charges.

2. Some of the delays in Burkett's cases were aptly termed "monumental" in *Burkett I*, 826 F.2d at 1210, and consequently Burkett's convictions for numerous serious crimes have already been overturned. Our task in this appeal is to determine whether Burkett's constitutional rights were violated by delay in imposing sentence and disposing of his direct appeal relating to the third set of charges. Applying the factors set out in *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), the majority concludes that a constitutional violation occurred. I respectfully disagree.

Turning first to the length of delay, I concur fully with the majority's conclusion that the gap between verdict and sentencing (29 months) was highly excessive. On the other hand, I do not think that the time from notice of appeal to affirmance by the Superior Court (18 months) may be similarly characterized.

The district court found that Burkett and the Commonwealth shared responsibility for causing the delays, and unlike the majority, I agree with this conclusion. There is no suggestion that the prosecution deliberately caused delay to hamper the defense. See *Barker*, 407 U.S. at 531, 92

S.Ct. at 2192. In addition, there is no doubt that Burkett's various applications, a good many of which do not concern complaints about delay, also prolonged the disposition of his case. To take the most striking example, within days after the guilty verdicts, Burkett's attorney filed a one-page "Motion in Arrest of Judgment and/or For New Trial." Among other things, this motion asserted without any elaboration that "[t]he verdict was against the weight of the evidence" and "against the law." Without a supporting brief, the trial court could not have possibly decided this motion on the merits, but the defense did not file such a brief until *23 months later*. In light of this extraordinary lag, the defense surely must share responsibility for the delay. While the trial judge could have prevented defense counsel's conduct from delaying sentencing by issuing a briefing deadline and dismissing the motion in the event of noncompliance, the trial judge's inaction does not completely exonerate the defense.

My major disagreement with the majority concerns the question of prejudice, which is "the polestar of any post-conviction speedy trial analysis." *Burkett I,* 826 F.2d at 1232 (Garth, J., dissenting). The majority finds that the delay caused prejudice for three reasons: (1) Burkett was incarcerated in the county jail rather than in state prison, where he claims he would have enjoyed access to rehabilitation programs and visitation rights; (2) he suffered anxiety and distress caused by uncertainty about the length of the sentence that would be imposed and the disposition of his appeal; and (3) the delay might have had an impact on his defense at a retrial. In my view none of these reasons is entitled to much if any weight here.

I would not hold on the present record that Burkett was prejudiced because he was incarcerated in the county jail rather than a state prison. *See Perez v. Sullivan,* 793 F.2d 249, 257 (10th Cir.), *cert. denied,* 479 U.S. 936, 107 S.Ct. 413, 93 L.Ed.2d 364 (1986). If the relative conditions at the jail and prison are important for present purposes, then a careful evaluation based on reliable evidence is necessary. The majori-

ty, instead, relies solely on Burkett's testimony that he preferred the prison. There is no objective evidence comparing the jail and prison; nor did the district court make any findings regarding the comparative desirability of the two institutions. I certainly would not find on appeal that one institution is more desirable than another based solely on a transcript of the testimony of a witness who testified knowing that several decades of incarceration were potentially at stake. More fundamentally, I would hold that differences between penal institutions can rarely, if ever, provide a basis for finding prejudice under *Barker.* Otherwise, the federal courts will have to start to compile comparative rankings of jails and prisons, an enterprise that does not have much to do with the constitutional right to a speedy trial, sentence, or appeal.

Nor would I conclude that Burkett was significantly prejudiced by anxiety and distress caused by uncertainty about the length of the sentence that would be imposed or the outcome of his direct appeal. Again, the majority relies solely on Burkett's own testimony, and even this testimony does not show the kind of unusual mental suffering that our prior cases have demanded before placing much weight on this factor. *See Government of the Virgin Islands v. Pemberton,* 813 F.2d 626, 630 (3d Cir.1987); *United States v. Dreyer,* 533 F.2d 112, 116–17 (3d Cir.1976). *See also Perez,* 793 F.2d at 257, ("the anxiety of an accused [awaiting trial] is not to be equated for constitutional purposes with anxiety suffered by one who is convicted, in jail, unquestionably going to serve a sentence, and only waiting to learn how long that sentence will be"). If we are willing to find significant prejudice merely because a defendant states that he or she suffered from anxiety and distress, we might as well deem prejudice to exist in every case involving delay.

Finally, I am puzzled by the majority's reliance on the possible impact of the sentencing delay on Burkett's defense at a retrial. Since no court has held that Burkett is entitled to a new trial, it makes no

difference whether delay would have any effect if he were retried.

Taking all of the facts together and placing particular weight on the lack of demonstrable prejudice, I would not hold that a constitutional violation occurred. In reaching this conclusion, I emphatically do not approve or condone the type of delays that occurred throughout this case.

Having found a constitutional violation, the majority grapples with the question of remedy, recognizing, I believe, the anomaly presented by Burkett's request to be discharged because of delay that has apparently had no impact whatsoever on the sentence imposed, the amount of time he will spend in custody, or the disposition of his appeal. The majority's answer is to reduce Burkett's sentence. The problems with this approach are self-evident. The Second Circuit's alternative solution deserves consideration. Under that approach, state prisoners experiencing post-verdict delay are excused from compliance with exhaustion requirements after a shorter period of time than might otherwise be required, their habeas petitions are expedited, and conditional writs are granted requiring disposition of post-verdict proceedings within a specified period. *See Cody v. Henderson,* 936 F.2d 715 (2d Cir.1991); *Diaz v. Henderson,* 905 F.2d 652 (2d Cir. 1990); *Simmons v. Reynolds,* 898 F.2d 865 (2d Cir.1990). Where a state prisoner does not seek such a conditional writ, however, habeas relief is granted only if delay unconstitutionally tainted the outcome of the post-verdict proceedings. *Id.*