RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 05a0196p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

FRANK HOWARD,

      *Petitioner-Appellant,*

    *v.*

BARBARA BOUCHARD, Warden,

      *Respondent-Appellee.*

No. 03-1850

---

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 00-73961—Denise Page Hood, District Judge.

Argued: January 25, 2005

Decided and Filed: April 28, 2005

Before: MOORE and GILMAN, Circuit Judges; GWIN, District Judge.[*]

---

## COUNSEL

**ARGUED:** James R. Gerometta, FEDERAL PUBLIC DEFENDER'S OFFICE, Detroit, Michigan, for Appellant. Janet A. Van Cleve, OFFICE OF THE ATTORNEY GENERAL, HABEAS CORPUS DIVISION, Lansing, Michigan, for Appellee. **ON BRIEF:** James R. Gerometta, Andrew N. Wise, FEDERAL PUBLIC DEFENDER'S OFFICE, Detroit, Michigan, for Appellant. Debra M. Gagliardi, OFFICE OF THE ATTORNEY GENERAL, HABEAS CORPUS DIVISION, Lansing, Michigan, for Appellee.

      GWIN, D. J., delivered the opinion of the court, in which GILMAN, J., joined. MOORE, J. (pp. 21-22), delivered a separate dissenting opinion.

---

## OPINION

---

      GWIN, District Judge. With this case we decide whether Petitioner-Appellant Frank Howard ("Howard") was denied his constitutional right to due process when a Michigan court permitted three eyewitnesses to identify Howard as the killer of Theodore Hankinson. Howard complains that the three eyewitnesses saw Howard at two scheduled, then cancelled, preliminary hearings before they identified him in a lineup. Howard argues that seeing him at the hearings was impermissibly suggestive and that their subsequent identifications of Howard as the person who killed Hankinson were not otherwise reliable.

---

[*] The Honorable James S. Gwin, United States District Judge for the Northern District of Ohio, sitting by designation.

On April 2, 1990, a Michigan jury found Petitioner Frank Howard guilty of second degree murder. After Howard lost his appeals and post-conviction appeals in the Michigan state courts, he petitioned for a writ of habeas corpus. The district court denied Howard's petition.

On appeal from that denial, Howard offers three arguments. First, Howard contends that the admission of eyewitness Ken Gapinski's identification testimony violated his due process rights. Second, he similarly argues that the admission of identifications made by witnesses Patrick Chorney and Thomas Carter violated his due process rights. Third, he argues that his trial counsel's failure to challenge the latter two identifications before or during the trial violated his right to the effective assistance of counsel. The Appellee Barbara Bouchard, Warden, opposes the petition. For the reasons that follow, we **AFFIRM** the decision of the district court to deny the writ.

## I. BACKGROUND

### A. Factual History

On June 9, 1989, at approximately 4:00 am, Theodore Hankinson was needlessly killed while attempting to repossess a truck from a residence at 19300 Telegraph Road, in Detroit, Michigan. Three other men -- Patrick Chorney, Thomas Carter, and Kenneth Gapinski -- accompanied decedent Hankinson at the time he was killed. Gapinski was Hankinson's brother. The men sought to repossess a Toyota pickup truck that Cynthia Shumate, who lived at 19300 Telegraph, had purchased using credit. Shumate was five months pregnant with Petitioner Howard's child on June 9, 1989. When the four men arrived at 19300 Telegraph, the decedent Ted Hankinson was driving the tow truck used to repossess the Toyota pickup. Patrick Chorney occupied the passenger's seat. Ken Gapinski and Thomas Carter sat in the open bed area.

After arriving at the residence, Hankinson backed the tow truck up the driveway and into the backyard to take possession of the pickup truck. The driveway ran along the side of the house. After putting the repossessed Toyota pickup upon the bar of the tow truck, Ken Gapinski crawled onto the Toyota to check the vehicle identification number. As he crawled onto the truck, an alarm went off. Gapinski, Chorney, and Carter then heard a gunshot. Gapinski and Carter, who had been attaching the boom to the tow truck, jumped back into the tow truck and lay down in the truck's bed.

Hankinson, who was driving, pulled the tow truck alongside the porch. A man with a rifle stood on the porch. A woman, later identified as Shumate, stood nearby. Hankinson showed Shumate and the man paperwork for the repossession. The man yelled and demanded: "put the truck down." Hankinson complied and released the vehicle. At that point, Hankinson's tow truck was only about three feet away from the two individuals on the porch. The shooter then pointed the gun at Chorney, who was sitting in the passenger seat and who had just called the police. The shooter told Chorney to put the phone down.

The tow truck proceeded to leave, moving down the driveway without the repossessed truck. As the tow truck moved down the driveway toward the street, the shooter fired four or five more shots. Hankinson then yelled out that he'd been shot. As the truck began to roll, Gapinski, who had been ducking down in the back, jumped out of the bed and opened the driver-side door to apply the brake and help Hankinson. After being shot in the head, Hankinson had fallen over onto Chorney. The men were somewhere between 15 and 35 feet away from the porch by the time the truck was stopped. Gapinski went to the hospital with Hankinson. Chorney and Carter stayed at the scene until the police came.

Once the police arrived at the scene, Chorney and Carter completed the repossession, and then went to the police station. At the station, Chorney and Carter gave the police descriptions of the shooter. Carter described the shooter as a "black/male/20s, light complx [sic], short hair, thin mustache. I think he was dressed in underwear (boxer shorts)." J.A. 509. Chorney described the shooter as having a smaller build and short hair.

The police also showed Chorney and Carter a photographic lineup of suspects, in which Petitioner Frank Howard was pictured at position No. 1. Chorney and Carter failed to pick out Petitioner from that photo lineup. At trial, Chorney first testified that he had not identified any of the pictures as the shooter. On cross-examination, Chorney testified that he had picked out a different suspect, the suspect labeled No. 4. The police reports indicating Chorney and Carter's identifications each show an "X" next to No. 4, and the phrase "No. I.D." written on the bottom right-hand corner of the page. In testimony that conflicted with Chorney's, Sergeant Harvel, the chief investigating officer on the Hankinson killing, testified that "No I.D." meant that Chorney and Carter had not picked out anyone in the photo array. Regarding the photo array, Suspect No. 1 (Howard) and Suspect No. 4 presented similar appearances. J.A. 715-16.

Gapinski gave a description to the police in August 1989, two months after the shooting. In that description, he described the killer as "a black man with tan shorts on and he had a rifle with a clip. The rifle was real short." Gapinski never participated in a photo identification. Gapinski participated in no identification procedure at all until after the first scheduled preliminary hearing.

In September 1989, police arrested Petitioner Frank Howard for the shooting of Theodore Hankinson. On September 20, 1989, all three eyewitnesses came to court for Howard's scheduled preliminary examination. Before the hearing commenced, Howard was brought out of lockup and seated at the defense table. It is not clear that any of the witnesses had a significant opportunity to view Howard. Chorney testified that he was outside of the court room smoking during the majority of his time at the court house. With regard to his ability to see Howard at the preliminary hearing, Gapinski testified that he saw the back of Howard, but was not paying much attention because he was talking to his family. The hearing was adjourned until September 27, 1989.

On September 27, 1989, with Gapinski again present in the courtroom, Howard was brought out of the lockup and seated at the defense table. The other two witnesses, Chorney and Carter, entered the courtroom when Howard was already seated at the defense table. They then left. The proceedings were again adjourned. At neither proceeding did law enforcement officers say anything to the witnesses to suggest that Howard was the killer.[1]

About one hour following that adjournment, the police conducted a lineup with defense counsel present. Gapinski, Chorney, and Carter were separately asked to identify the killer. After viewing the lineup, each witness was taken to a different room in order to prevent any communication between the witnesses. All three witnesses picked Howard as the killer.

The preliminary examination took place on October 2, 1989. Gapinski, the decedent's brother, was the only witness to testify. At the preliminary examination, he identified Howard as the person who had shot his brother. Thereafter, defense counsel moved to exclude Gapinski's in-court and lineup

---

[1]Gapinski testified:

Q. Now, when you came into the courtroom on that date did anybody say anything to you prior to going into the courtroom as far as that, the person that did the shooting was going to be in there or who it was going to be?

A. No, sir. They said nothing really.

Q. You knew you were there for a preliminary examination, right?

A. Yes, they said I was supposed to be there.

Q. Did anybody point him out to you?

A. No, sir, I didn't see nothing until we went into the courtroom.

J.A. 68-68.

identifications on the basis of *United States v. Wade*, 388 U.S. 218 (1967). With this motion, Howard first argued that the two courtroom confrontations prior to the lineup tainted the identification. Second, Howard claimed that the lineup impermissibly singled out the defendant in the array. After conducting a hearing on Howard's challenge to Gapinski, the trial court admitted Gapinski's identification testimony.

Howard's trial counsel did not challenge Carter's and Chorney's identifications of Howard as the killer. The case proceeded to trial. At trial, too, Gapinski, Chorney, and Carter each identified Howard as the person who had shot and killed Hankinson.

## B. Procedural History

On April 2, 1992, a jury convicted Howard of second degree murder and a felony firearm offense. On direct appeal to the Michigan Court of Appeals, and represented by new counsel, Petitioner raised two issues. First, he argued that the trial court erred when it admitted testimony about the identification that Gapinksi made at a lineup. Second, Howard argued that the trial court erred in sentencing. On April 30, 1993, the Michigan Court of Appeals affirmed the conviction, but remanded for resentencing.

On May 25, 1993, Howard, moving in pro per, filed a motion for reconsideration with the Michigan Court of Appeals. The motion again challenged the admission of Gapinski's testimony, and implicitly raised a question as to the identification testimonies of Chorney and Carter, the other two witnesses. On September 2, 1993, the Court of Appeals denied Petitioner's motion for reconsideration. In November 1993, Howard was resentenced.

In October 1993, Petitioner filed a motion for leave to appeal to the Michigan Supreme Court. With that motion, he again challenged the admission of Gapinski's identification testimony. He also raised two new issues – a challenge to the admission of certain photographs he claimed to be prejudicial, and a challenge to the admission of Chorney's and Carter's identification testimony. On March 29, 1994, the Michigan Supreme Court denied Petitioner Howard's motion for leave to appeal.

On April 17, 1997, Howard filed a state-court action seeking post-conviction relief, pursuant to Michigan Court Rule 6.500. With that motion, Howard raised the issues he subsequently included in his federal habeas petition – due process violations regarding the identifications of all three witnesses, ineffective assistance of trial counsel, and ineffective assistance of appellate counsel. On July 20, 1998, the state court denied Howard's motion for relief from judgment. The state court found that Howard had defaulted claims not brought earlier. *People v. Howard*, No. 92-010743 (Mich. Crim. Ct., Wayne Cty., July 20, 1998) (citing M.C.R. 6.508). Both the Michigan Court of Appeals and the Michigan Supreme Court denied Howard's motion for leave to appeal. On September 20, 2000, the Petitioner timely brought this habeas action. On June 23, 2003, the federal district court denied habeas relief, and the Petitioner timely appealed.

## II. LEGAL STANDARD

In this habeas corpus proceeding, we review the district court's findings of fact for clear error and its conclusions of law de novo. *Lott v. Coyle*, 261 F.3d 594, 606 (6th Cir. 2001). Where there is a mixed question of law and fact, we review the district court's findings *de novo*. *United States v. Carter*, 355 F.3d 920, 924 (6th Cir. 2004).

Federal habeas review of the state court's decision is governed by the standards established in the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). That act applies here, because Petitioner filed his petition for habeas corpus after the Act became effective.

Under AEDPA, a federal habeas court may grant an application for a writ of habeas corpus on behalf of a state prisoner only where a claim adjudicated on the merits in state court

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). A decision of the state court is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the United States Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 413 (2000).

An "unreasonable application" occurs when "the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* A state adjudication is not "unreasonable" "simply because [a federal habeas court] concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411. Instead, the state court's application of established Supreme Court precedent must be objectively unreasonable. *Woodford v. Visciotti*, 537 U.S. 19, 24-25 (2002).

Where the state court has not addressed or resolved claims based on federal law, most courts, including this one, have held that the decision is not an "adjudication on the merits." Thus, a federal habeas court reviews such unaddressed claims de novo. *See McKenzie v. Smith*, 326 F.3d 721, 727 (6th Cir. 2003) (distinguishing "no results" from no reasoning).

Where, however, the state court disposes of a constitutional claim but fails to articulate its analysis, the rule is less clear. The Petitioner argues that because the state courts did not articulate their reasoning for denying the due process claim, the federal court should review the constitutional claims de novo. The Respondent argues that the state court's result remains entitled to deferential review.

We have taken an intermediate approach -- in between de novo review and complete deference. We have held that a federal habeas court must conduct an independent review of the record and applicable law to determine whether, under the AEDPA standard, the state court decision is contrary to federal law, unreasonably applies clearly established law, or is based on an unreasonable determination of the facts in light of the evidence presented. *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000) (citing *Aycox v. Lytle*, 196 F.3d 1174, 1177-78 (10th Cir. 1999)).

The independent review, however, is not a full, de novo review of the claims. *Id.* As we held in *Harris*, the review remains deferential, because the court cannot grant relief unless the state court's result contradicts the strictures of AEDPA. *Id.*

Below, we review Petitioner's claims according to the dictates of AEDPA and *Harris*.

### III. DISCUSSION

With his appeal, the Petitioner Howard raises three issues. We address them in turn.

### A. Admission of Gapinski's Eyewitness Identification and Testimony

Howard challenged the admission of Gapinski's identification on direct review through the state courts and, subsequently, in his federal habeas petition. Howard did not procedurally default this claim. We may thus address the merits of Howard's due process claim as to Gapinski.

### 1. Standard of Review

As mentioned above, where the state court has not articulated its reasoning for rejecting a constitutional claim, we conduct an independent review of the record to determine whether the state court's decision "was based upon an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000).

In the record originally transmitted to this Court, neither the Respondent nor the Petitioner provided any state-court opinion discussing Howard's motion to preclude Gapinski's identification testimony. Instead, the state court simply permitted the testimony. In her appellate brief, however, Respondent Bouchard quoted extensively from an undocketed opinion of the Wayne County Circuit Court, which ostensibly addressed the issue of Gapinski's identification. Before this Court, Petitioner Howard moved to strike those portions of Respondent's brief that cited to the undocketed opinion, on the basis that the inclusion violated Federal Rule of Appellate Procedure 10(a). In response, Respondent Bouchard moved this Court to supplement the record pursuant to Federal Rule of Appellate Procedure 10(e), and thereby admit the undocketed opinion.

We decline to supplement the record. First, nothing shows the opinion was filed or docketed with the state court. The copy provided by Respondent shows no time stamp or other indication that the opinion was genuine and was received for filing. Second, nothing suggests that the district court ever received or considered the materials. *See Thompson v. Bell*, 373 F.3d 688, 690 (6th Cir. 2004) (stating that the Sixth Circuit does not allow consideration of materials under Appellate Rule 10(e) that have not been considered by the district court), *cert. granted on other grounds*, 125 S. Ct. 823 (2005). Because nothing shows that the opinion was filed by the state court, or considered by the district court, we grant Petitioner's motion to strike portions of Respondent's brief, and deny Respondent's motion to supplement the record.

Having declined to admit the undocketed opinion, we have no statement from the trial court providing its reasoning for rejecting Howard's due process claim. Similarly, on appeal, the Michigan Court of Appeals rejected Howard's due process challenge, also without reasoning. The Michigan Court of Appeals stated:

> There was no error in the admission of identification testimony. Even if error had occurred, the testimony of other witnesses, which overwhelmingly established defendant's identity as the perpetrator, rendered the error harmless beyond a reasonable doubt. *People v. Hampton*, 138 Mich. App. 235, 239; 361 N.W.2d 3 (1984).

*People v. Howard, a.k.a., Frank Manning*, No. 130638 (Mich. Ct. App. Apr. 30, 1993). Like the trial court, the appeals court applied no Supreme Court or other precedent dealing with the issue of suggestive procedures. It also failed to articulate its reasoning for finding harmless error.

The Michigan Supreme Court denied leave to appeal in a one-sentence order, stating that it was "not persuaded that the questions presented should be reviewed by this Court." *People v. Howard,* No. 130638 (Mich. Sup. Ct. Mar. 29, 1994).

Thus, none of the courts provided reasoning for their denial of Petitioner's constitutional claim. We review the ruling of the Michigan Court of Appeals, as the last state court to address the issue, based on the intermediate deference standard outlined above.

### 2. Merits of Due Process Claim as to Gapinski's Identification Testimony

Petitioner Howard argues that admitting the identification testimony of Ken Gapinski, the decedent's brother, denied him due process because the identification resulted from an unnecessarily suggestive lineup and was otherwise unreliable. He argues that the lineup was impermissibly suggestive in two respects. First, he claims that the lineup violated his right to due process because it occurred after Gapinski saw the

defendant twice brought into the courtroom and seated at the defense table. Second, Howard argues that the lineup was impermissibly suggestive because the defendant was significantly taller than the fillers in the lineup and was the only one with a short haircut.

The Petitioner also claims that Gapinski's identification was not independently reliable such that it could overcome any taint of suggestiveness. He argues that Gapinski had only a limited opportunity to see the killer at the time of the crime, and that stress and anxiety at the time of the shooting may have affected his ability to identify the killer. Howard also argues that Gapinski's description of the shooter, given to police two months after the killing, was too general to be reliable. Finally, Petitioner Howard argues that the three-month gap between the incident and the identification was sufficiently long to reduce the reliability of the identification.

The Supreme Court has held that an identification violates a defendant's right to due process where the identification procedure was so unnecessarily suggestive as to run the risk of irreparable mistaken identification. *Stovall v. Denno*, 388 U.S. 293, 301-02 (1967); *Neil v. Biggers*, 409 U.S. 188 (1972); *see also Thigpen v. Cory*, 804 F.2d 893, 895 (6th Cir. 1986). "It is the likelihood of misidentification which violates a defendant's right to due process." *Neil*, 409 U.S. at 198. As the Supreme Court has stated, "reliability is the linchpin in determining the admissibility of identification testimony." *Manson v. Braithwaite*, 432 U.S. 98, 114 (1977). We thus first assess whether the identification was unnecessarily suggestive, then assess whether the identification was nonetheless reliable. If an identification is reliable, it will be admissible even if the confrontation was suggestive. *See id*; *Carter v. Bell*, 218 F.3d 581, 605 (6th Cir. 2000).

### a. Suggestiveness

Howard bears the burden of showing impermissible suggestiveness. *United States v. Hill*, 967 F.2d 226, 230 (6th Cir. 1992). Unnecessary suggestiveness generally depends "upon whether the witness's attention was directed to a suspect because of police conduct." 2-5 Crim. Con. Law § 5.05(2)(b) (2004). In considering this, we look to the effects of the circumstances of the pretrial identification, not whether law enforcement officers intended to prejudice the defendant. *Thigpen v. Cory*, 804 F.2d 893, 895 (6th Cir. 1986). In examining whether the identification procedure was impermissibly suggestive, the "primary evil to be avoided is a very substantial likelihood of irreparable misidentification." *Neil,* 409 U.S. at 198 (citing *Simmons v. United States*, 390 U.S. 377, 384 (1968)).

Gapinski testified that he saw Howard at the defense table at two preliminary hearings. In certain circumstances, such a preliminary viewing could be suggestive. *See Thigpen*, 804 F.2d at 896 (holding in-court identification unduly suggestive where witness saw defendant first in lineup, then in two court proceedings); *United States v. Emanuele*, 51 F.3d 1123, 1130 (3d Cir. 1995) ("[T]o walk a defendant– in shackles and with a U.S. Marshal at each side – before the key identification witnesses [was] impermissibly suggestive."). *But see United States v. Rundell*, 858 F.2d 425, 427 (8th Cir. 1988) ("Except for the suggestiveness inherent in the witnesses' knowing that appellant was the sole defendant charged with the robbery, there is no indication that the in-court identifications were based on anything other than the witnesses' observations at the time of the crime. Thus, the more important question is whether the identifications based on those observations were reliable even if the in-court confrontation was suggestive.") (citations omitted).

With regard to Gapinski, however, we find that the pretrial identification was only minimally suggestive. Gapinski testified that he was present on September 20, 1989, when Howard was brought out of the back of the courtroom and seated next to the defense counsel. He testified:

> I seen him - I seen the back of him sit down. I was down talking with the family and I really wasn't paying attention to what was going on. They brought him out, they sat him down. I seen the back of his head and it was adjourned and I seen him walking to the other room.

J.A. 195-96. As to the second scheduled courtroom proceeding, which took place on September 27, 1989, Gapinski testified only that he saw Howard "being brought out from the back and seated at the defense table" with the defense attorney. J.A. 196. Other than these descriptions, Howard provides no evidence that Gapinski saw Howard for any significant period of time or that Gapinski was positioned to get a good look at Howard before the lineup. Further, there is no evidence that law enforcement officers said anything to suggest to Gapinski that Howard was the killer. As acknowledged, we find Gapinski's viewing of Howard at the preliminary hearings was suggestive, although only minimally so.

The Dissent disagrees with our finding that the identification procedures were only minimally suggestive, characterizing them instead as "highly improper." As the cited testimony suggests, however, nothing indicates that Gapinski was ever close to Howard at the preliminary hearings, or that he ever viewed Howard's face at the preliminary hearing, or that he viewed Howard at the preliminary hearing for more than a very short period.

The Dissent also argues that "the state in its brief concedes that the district court properly concluded that the line-up procedure employed was unduly suggestive." It appears, however, that while the Respondent's brief to us did not contest suggestiveness with regard to Chorney's and Carter's views of Howard, it never conceded the same with regard to Gapinski. Respondent Br. at 16. In any case, whatever Respondent's position, we assess the record.

The Dissent relies heavily upon *Thigpen v. Cory*, 804 F.2d 893 (6th Cir. 1986), to suggest that the procedures here were particularly inappropriate, but *Thigpen* is distinguishable. In *Thigpen*, we reviewed a habeas petition challenging Michigan convictions for armed robbery and possession of a firearm. In the underlying case, two individuals had robbed a gas station. Following the robbery, police followed two sets of footprints to the defendant's house, a house occupied by three Thigpen brothers. According to petitioner Thigpen, he had been at home when his two brothers returned home shortly after the robbery. *Id.* at 894. Significantly, one of Thigpen's brothers, who had not been arrested, testified that police had overlooked him in their search of the house after the robbery. This same brother later testified that he, not Thigpen, had actually participated in the robbery. *Id.*

In *Thigpen*, the identifying witness observed the perpetrator for only an extremely brief period during the crime: "the second man was directly behind him most of the [five-minute robbery] time, [ ] he turned to look at him briefly only once, and [ ] although the man was not behind him after they moved to the back office, the office was dark and the witness was under a desk." *Id.* at 896.

At the trial of Thigpen's brother and before Thigpen's own arrest, the identifying witness saw Thigpen sit with his brother for extended periods during the trial, including during the witness's testimony at the brother's trial. *Id.* at 896. In contrast to the present case, the identifying witness saw Thigpen associated with a co-defendant for a significant period of time during the court proceedings before identifying Thigpen as one of the robbers. Finally, *Thigpen* was decided in 1986, before the heightened deference given state court factual determinations by AEDPA. Given these differences, *Thigpen* does not undercut our holding.

The Petitioner also argues that the lineup was unduly suggestive because he was substantially taller than the other defendants and was the only suspect with the high-fade haircut that the witnesses later said was so distinctive. Under certain circumstances, discrepancies in height may contribute to an impermissibly suggestive procedure. *See Foster v. California*, 394 U.S 440, 442-43 (1969). But a height differential, standing alone, is usually not enough to make a lineup procedure suggestive. *See, e.g., Millender v. Adams*, 376 F.3d 520, 525 (6th Cir. 2004). Here, Petitioner claims he was three inches taller than the fillers. On balance, we do not find such a discrepancy to have infected the process.

With respect to Petitioner's haircut, unless the witness described the distinctive characteristic to the police beforehand, that characteristic is not a basis for finding a lineup unduly suggestive. *See United States*

*v. Gibson*, 135 F.3d 257, 260 (2nd Cir. 1998) (photo array picturing defendant with goatee not improperly suggestive where defendant did not establish that witness earlier told police that perpetrator wore a goatee); *Alexandre v. Senkowski*, No. 97-cv-2482, 2003 U.S. Dist. LEXIS 13648, at *34-*39 (E.D.N.Y. 2003) (no tainted identification in lineup where defendant was only member with flat-top hairstyle, because witness had not previously stated to police that assailant had a flat-top haircut).

In this case, as in *Gibson* and *Alexandre*, neither Gapinski nor the other witnesses earlier told police about Petitioner's distinctive flat-top haircut. Thus, this aspect of the lineup was not suggestive. Apart from the minimal suggestiveness associated with Howard's presence at the two scheduled preliminary hearings, we find that no suggestiveness attended the lineup.

### b. Reliability

Even if Howard had been able to show the identification procedures were impermissibly suggestive, we nonetheless find reasonable the state court's conclusion that Gapinski's identification of Howard was reliable. As mentioned, "reliability is the linchpin in determining the admissibility of identification testimony." *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977).

In judging reliability, we consider the totality of the circumstances, including the factors described in *Manson* and *Biggers*: (1) the opportunity of the witness to view the defendant at the initial observation; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the defendant; (4) the level of certainty shown by the witness at the pretrial identification; and (5) the length of time between the initial observation and the identification. *Manson*, 432 U.S. at 114; *Biggers*, 409 U.S. at 199-200. We must weigh these factors against any "corrupting effect of the suggestive identification." *Manson*, 432 U.S. at 114.

As to the first factor, Gapinski had a good opportunity to view the shooter. Gapinski first saw the shooter as the truck was pulling past the porch. During this first viewing, Gapinski was "three feet or five or six feet" away from the shooter, although he "just got a glance then." J.A. 72.

Gapinski saw the shooter a second time when the killer began shooting again: "I heard two or three shots go off in a kind of quick format and I looked up and I seen him wave the gun and start shooting again." During this second observance, Gapinski saw the killer "a split-second again" but he "could see his face at that time." J.A. 74. Gapinski observed the shooter "long enough to [see him] raise his gun and point it to the cab of the truck." J.A. 74. At that point, the shooter was "ten or fifteen feet" away. J.A. 75.

Gapinski observed the shooter a third time after his brother yelled out that he had been shot: "He raised, I watched him raise the gun, he started shooting at the cab of the truck and I heard my brother holler . . . and then the truck stopped and me and Tommy jumped up. I stood up and looked towards the porch and [the shooter] was stirring around, picking up something, it looked like shells." J.A. 75. At the time he observed the shooter picking up shells, Gapinski was "approximately 30 or 40 ft." away. J.A. 76. As he climbed out of the truck and looked back to the porch, he observed the shooter "standing there pretty big." He saw him for "about a minute and a half, maybe a little longer, long enough to stand up and jump over the side of the truck." J.A. 72-76. Gapinski also testified that "everything was very well lit, [there] was a street light pretty close by too." J.A. 76.

Given that Gapinski had three opportunities to view the perpetrator, at times within 3-6 feet, and that he looked at the shooter for more than a minute as the shooter picked up shells, we conclude that Gapinski had a good opportunity to view Howard at the shooting.

We turn to consideration of the second factor -- whether the witness was attentive. To analyze the sufficiency of an eyewitness's degree of attention, we generally examine the circumstances surrounding the witness's encounter. *United States v. Thomas*, 116 Fed. Appx. 727, 736 (6th Cir. 2004), *vacated on other grounds*, 2005 U.S. LEXIS 1367 (remanding in light of *United States v. Booker*, 125 S. Ct. 738 (2005)).

We find more reliability where a witness was able to view the assailant with a "heightened degree of attention, as compared with disinterested bystanders or casual observers." *United States v. Crozier*, 259 F.3d 503, 511 (6th Cir. 2001) (quotation omitted). Generally, we place greater trust in witness identifications made during the commission of a crime because the witness has a reason to pay attention to the perpetrator. *See United States v. Meyer*, 359 F.3d 820, 826 (6th Cir. 2004) (finding heightened degree of attention where witness spoke with robber and studied his features while looking for an opportunity to escape); *Crozier*, 259 F.3d at 511 (finding heightened degree of attention where robber confronted witnesses with a gun).

In this case, the eyewitnesses were participating in a repossession, which by its stressful nature generally demands heightened attention. The early fired gunshot gave Gapinski further reason to be attentive. Finally, in his third viewing of the perpetrator, as he climbed over the side of the truck, Gapinski watched the shooter carefully, both because he knew the man had just shot his brother, and in order to avoid getting shot himself. These facts, taken together, suggest that Gapinski was extremely attentive.

The third factor examines the accuracy of the witness's prior description of the defendant. Gapinski first gave a description to the police in August 1989, two months after the shooting. In this case, only cursory notes exist of the police interview of Gapinski. According to those notes, Gapinski told the police that the perpetrator was "a black man with tan shorts on. He had a rifle with a clip. The rifle was real short." J.A. 506. Although this description is sparse, it is not inaccurate. Petitioner argues that the police notes do not mention the short flat-top haircut that Gapinski later testified was so distinctive. But Gapinski testified that he noticed the hairstyle during the incident on June 9, 1989 and had simply not described it, stating that he was better at recognizing than describing. He also testified that he recognized the distinctive haircut right away when he first saw the Petitioner in the courtroom. Thus, we find the third factor satisfied.

The fourth factor examines the level of certainty shown by the witness at the pretrial identification. Gapinski immediately picked Howard out of the lineup. In court, he testified without equivocation that Howard was the killer. Further weighing in Gapinski's favor is his clean "record of reliability," as he had not previously had an opportunity to identify the shooter. *See Biggers*, 409 U.S. at 201 (noting that witness had a good "record of reliability," insofar as she had not identified any suspect in previous showups, lineups, and photographic showings). Thus, Gapinski's certainty supports the reliability of his identification.

The fifth factor looks at the length of time between the initial observation and the identification. The initial observation happened on June 9, 1989. The identification occurred on September 27, 1989. The trial commenced in March 1990. Three months is not a great length of time between an observation and identification. *See United States v. Causey*, 834 F.2d 1277, 1286 (6th Cir. 1987) ("A three to four-month delay between the crime and the identification does not render the identification inherently unreliable.").

Under the totality of the circumstances, we find reasonable the state court's conclusion that Gapinski's identification was sufficiently reliable to overcome any suggestive procedure. Most important, Gapinski was closely proximate to the killer at the time of the shooting. Nothing shielded the shooter's features. Gapinski was highly alerted by the gun shots and tense situation. He unequivocally picked out Howard only three months after the crime. His identification was reliable.

Our finding here is consistent with past decisions in which we have found identifications reliable. In *United States v. Meyer*, 359 F.3d 820 (6th Cir.), *cert. denied*, 125 S. Ct. 112 (2004), we discussed the *Biggers* factors against a backdrop similar to the facts presented here. We examined whether a victim had sufficient opportunity to observe the perpetrator of a postal robbery to overcome an arguably suggestive pretrial identification.[2] We found that he did.

_____

[2]In *Meyer*, an investigating postal inspector had obtained an identification through the display of a single photograph of the defendant. 359 F.3d at 825.

In *Meyer,* the witness had observed the perpetrator at close range for the two to four minutes the robbery lasted. The perpetrator had opened the postal driver's door, pointed a gun in the driver's face, and demanded a cash box. The perpetrator then directed the driver to go to the rear of the truck, which the driver did. *Id.* at 823. While the robber was searching the truck, the driver escaped out the rear, running across the loading dock into the post office. We found these circumstances sufficient for a reliable identification even though the victim "could not see the perpetrator's face for some fraction of the incident." *Id.* at 825-26. We also found it sufficient despite the fact that the driver had given an inaccurate former description of the defendant: He had described the robber as a man in his twenties or thirties, whereas the defendant was in his forties, and he had failed to mention Meyer's grey hair and facial hair.

In addition to *Meyer*, a number of our cases have held identifications sufficiently reliable despite the presence of suggestive procedures. *See United States v. Causey*, 834 F.2d 1277, 1286-87 (6th Cir. 1987) (holding in-court identification sufficiently reliable, even where witness only saw person sitting in car for short period of time, could not testify to vital descriptive details of person he saw in the car, and on other occasions could not identify the defendant as person in car); *United States v. Crozier*, 259 F.3d 503, 512 (6th Cir. 2001) (in-court identification of robber sufficiently reliable even though witness had described the robber as sixty pounds heavier, the robbery took place over only a ten-minute period, and witness earlier had been unable to describe the robber); *United States v. Hill*, 967 F.2d 226, 232 (6th Cir. 1992) (in-court identification admissible even though the witness had given an earlier inconsistent description and "had only a couple of minutes to view a robber who was disguised with a ball cap, sunglasses, and a bandage on his nose"); *Thomas*, 116 Fed. Appx. at 736 (unreported decision) (bank teller's identification testimony sufficiently reliable even though witness had only a brief encounter with the robber before the commission of the robbery and the witness did not see the actual robbery occur nor had the witness earlier given a description of the robber).

In *Burkett v. Fulcomer*, 951 F.2d 1431 (3d Cir. 1991), the Third Circuit examined similar facts in a habeas petition. There, a police officer escorted the victim to Burkett, who was handcuffed, immediately before a preliminary hearing. The officer then asked the victim if Burkett was the perpetrator. The Third Circuit found the victim's face-to-face confrontation with the perpetrator in her house lasting approximately one-half hour gave her a sufficient basis to overcome any corrupting influence from the preliminary hearing episode. *Id.* at 1448.

Against this precedent, we find that the trial court's decision to admit Gapinski's testimony was not unreasonable under the governing AEDPA standard. We further find the Michigan appellate court's conclusion upholding the ruling reasonable.

### B. Admission of Chorney's and Carter's Identification Testimony

In addition to Petitioner Howard's due process challenge to Gapinski's testimony, Petitioner also makes a due process challenge to the identification testimony of Patrick Chorney and Thomas Carter, the two other men who accompanied decedent Hankinson on the June 9, 1989 repossession. As with his argument regarding Gapinski, Petitioner argues that the lineup conducted after the two men had seen him seated at the defense table in the courtroom fatally tainted their identifications. He further argues that the two men's identifications were not independently reliable such that they could overcome the unnecessarily suggestive confrontation and procedure. Supporting these claims, Howard points to the fact that just a few hours after the incident, the two witnesses were unable to pick Petitioner out of a photo lineup of suspects. He argues that each independently picked out the same suspect – someone other than Petitioner.

### 1. Standard of Review

Because of procedural default, the Michigan state courts never addressed the merits of Howard's due process challenge to Chorney's and Carter's identification evidence. Howard failed to raise the claim before the Michigan Court of Appeals. He raised it for the first time in his direct appeal to the Michigan

Supreme Court. That court refused to entertain any of Petitioner's claims on appeal, including the challenge to Chorney's and Carter's identifications. Petitioner subsequently brought a state post-conviction petition for relief from judgment in the trial court. There, the state district court denied his motion on procedural grounds. The appellate courts affirmed on the same basis. Because this claim was never "adjudicated on the merits," we review it de novo.

### 2. Procedural Default

Because Petitioner failed to raise his challenge to Chorney's and Carter's identification testimony on direct appeal to the Michigan Court of Appeals, we must first assess whether procedural default bars our review of Petitioner's claim on the merits.

Federal courts "will not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment." *Coleman v. Thompson*, 501 U.S. 722, 729 (1991). As applied in the habeas context, this doctrine precludes federal courts from reviewing claims that a state court has declined to address, because of a petitioner's noncompliance with a state procedural requirement. *See Wainwright v. Sykes*, 433 U.S. 72, 87 (1977). "In these cases, the state judgment rests on independent and adequate state procedural grounds." *Coleman*, 501 U.S. at 730. For purposes of procedural default, the state ruling with which the federal court is concerned is the "last explained state court judgment." *Munson v. Kapture*, 384 F.3d 310, 314 (6th Cir. 2004) (citing *Yist v. Nunnemaker*, 501 U.S. 797, 805 (1991)) (emphasis removed).

Before the district court, the Respondent argued that Howard had procedurally defaulted his due process challenge to Chorney's and Carter's identifications. While noting that Respondent asserted the defense, the district court never specifically ruled upon the issue. On appeal, Respondent Bouchard has now failed to re-assert the procedural default defense it raised below.

Procedural default is not a jurisdictional bar to review on the merits, and an appeals court is not required to address the issue sua sponte. *Trest v. Cain*, 522 U.S. 87, 89 (1997). We have previously held, however, that the court of appeals may raise the issue of procedural default sua sponte. *Lorraine v. Coyle*, 291 F.3d 416, 426 (6th Cir. 2002); *Elzy v. United States*, 205 F.3d 882, 886 (6th Cir. 2000). Like many of our sister circuits, we agree that appellate courts should not "embrace *sua sponte* raising of procedural default issues as a matter of course." *Flood v. Phillips*, 90 Fed. Appx. 108, 114, 2004 U.S. App. LEXIS 1555, at *15 (6th Cir. 2004) (citing *Rosario v. United States*, 164 F.3d 729, 732-33 (2d Cir. 1998)). Here, however, we find it appropriate to do so.

The main concern with raising procedural default sua sponte is that a petitioner not be disadvantaged without having had an opportunity to respond. *See, e.g., Lorraine* 291 F.3d at 426 (stating importance of giving petitioner an opportunity to respond, before raising procedural default sua sponte). Here, that concern is not present. In its response to the habeas petition, Respondent raised procedural default as a defense at the district court level. In its initial response to the petition, Michigan argued "Review of Petitioner's habeas claims [involving Chorney's and Carter's identifications] is barred by his procedural default." Habeas Resp. at 10. Howard received notice that procedural default was at issue and had an opportunity to address the issue.

District Judge Hood acknowledged that Michigan had raised procedural default as a defense. In her opinion allowing Howard to conduct discovery and submit additional briefing, Judge Hood identified the issues presented in the case. Among the issues that Judge Hood identified was whether cause and prejudice excused Howard's failure to exhaust state remedies:

> "I. Was petitioner denied the effective assistance of trial and appellate counsel when counsel failed to challenge the admissibility of the identification testimony of Patrick Chorney and Thomas Carter at trial and in petitioner's appeal of right and does this ineffective assistance

of counsel constitute adequate cause for petitioner's failure to present these claims in petitioner's appeal of right and show prejudice therefrom?”

J.A. 636 (order granting evidentiary hearing).

Indeed, Howard's own habeas petition reflects his knowledge that procedural default would be an issue in the district court habeas case. In Ground One of his habeas petition, Howard argued: “Appellate counsel's omissions of obvious and significant issues . . . constituted ‘cause’ for stronger claims not being raised on the appeal of right and/or by prior motion, resulting in ‘actual prejudice’ . . .” J.A. 14.

The district court never explicitly ruled on the procedural default issue. The Respondent did not explicitly renew the procedural default argument before us. However, given that Petitioner was aware of the issue, and in the interest of “comity, federalism, and judicial efficiency,” *see Scott v. Cullins*, 286 F.3d 923, 930 (6th Cir. 2002) (quoting *Boyd v. Thompson*, 147 F.3d 1124, 1128 (9th Cir. 1998)), we think it appropriate to determine whether Petitioner has procedurally defaulted on his claims. In finding it appropriate to review the procedural default issue, we raise no issue that Howard was not previously aware of.

We have articulated a four-part test to determine whether a habeas claim has been procedurally defaulted: (1) whether there is a state procedural rule that is applicable to the petitioner's claim; (2) whether the petitioner failed to comply with that rule; (3) whether the procedural rule was actually enforced in the petitioner's case; and (4) whether the state procedural forfeiture is an adequate and independent state ground on which the state can rely to foreclose review of a federal constitutional claim. *See Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986); *Clinkscale v. Carter*, 375 F.3d 430, 440 (6th Cir. 2004); *Munson v. Kapture*, 384 F.3d 310, 314 (6th Cir. 2004).

In this case, prongs (1), (3), and (4) are readily met. Mich. Ct. Rule 6.508 is an applicable state procedural rule that was actually enforced in Petitioner's case. Under that Michigan procedural rule: “The *court may not grant relief* to the defendant if the motion . . . (3) *alleges grounds for relief*, other than jurisdictional defects, *which could have been raised on appeal from the conviction* and sentence or in a prior motion under this subchapter, unless the defendant demonstrates (a) good cause for failure to raise such grounds on appeal or in the prior motion, and (b) actual prejudice from the alleged irregularities that support the claim for relief.” M.C.R. 6.508(D)(3) (emphasis added).[3]

The Wayne County Circuit Court, reviewing Petitioner's motion for relief from judgment, denied the motion on grounds that Petitioner had not demonstrated the “good cause” and “actual prejudice” required by M.C.R. 6.508(D)(3). *People v. Howard,* No. 92-010743 (Mich. Crim. Ct, Wayne Cty. July 20, 1998). Both the Michigan Court of Appeals and the Michigan Supreme Court affirmed the denial, rejecting Petitioner's application for leave to appeal on grounds that he had failed “to meet the burden of establishing entitlement to relief under MCR 6.508.” *People v. Howard*, No. 89-011438 (Mich. Ct. App. 10-13-99); *People v. Howard*, No. 89-011438 (Mich. Sup. Ct. Aug 22, 2000). Thus, prongs (1) and (3) of the *Maupin* 4-part test for procedural default are met.

Prong (4) is also satisfied. It is well-established in this circuit that the procedural bar set forth in Rule 6.508(D) constitutes an adequate and independent ground on which the Michigan Supreme Court may

---

[3]M.C.R. 6.508 further states, in relevant part:
“As used in this subrule, “actual prejudice” means that, “(i) in a conviction following a trial, but for the alleged error, the defendant would have had a reasonably likely chance of acquittal; . . . (iii) in any case, the irregularity was so offensive to the maintenance of a sound judicial process that the conviction should not be allowed to stand regardless of its effect on the outcome of the case. . . . The court may waive the “good cause” requirement . . . . if it concludes that there is a significant possibility that the defendant is innocent of the crime.”

rely in foreclosing review of federal claims. *See Simpson v. Jones*, 238 F.3d 399, 407-08 (6th Cir. 2000); *Munson*, 384 F.3d at 315.

Whether prong (2) -- failure to comply with the rule -- was satisfied requires somewhat more analysis. M.C.R. 6.508 stops the grant of post-conviction relief grounded upon issues "which could have been raised on appeal from the conviction and sentence or in a prior motion under this subchapter, unless the defendant demonstrates [cause and prejudice]." Clearly, Petitioner Howard failed to raise the due process challenge to Chorney's and Carter's identifications on appeal to the Michigan Court of Appeals. The question is whether he showed adequate cause and prejudice. The federal district court, reviewing the habeas petition, made no explicit determination as to this prong, but noted that the state court had found procedural default "without addressing petitioner's allegations that ineffective assistance" had caused the default and prejudiced him. *Howard v. Bouchard*, No. 00-cv-73961, at *11 (E.D. Mich., June 10, 2003) (order granting evidentiary hearing). The district court held an evidentiary hearing to develop the factual basis for Petitioner's ineffectiveness claim. *See id.* at *26 (order granting evidentiary hearing).

We note that M.C.R. 6.508(D)(3) derives its cause-and-prejudice standard from Supreme Court case law that articulates the constitutional standard for reviewing procedural default more generally. *See Wainwright v. Sykes*, 433 U.S. 72, 87 (1977). Thus, in assessing whether the second prong of the procedural default analysis is satisfied, and in assessing whether Petitioner was excused from the default, we make only one inquiry.

In this case, Petitioner raised ineffective assistance of counsel -- both trial and appellate -- as "cause" for not raising his due process challenge to Chorney and Carter. Counsel's deficient performance may constitute cause for procedural default, but only if it is constitutionally ineffective under the standard established in *Strickland v. Washington*, 466 U.S. 668 (1984). *Murray v. Carrier*, 477 U.S. 478, 488-89 (1986). Thus we must determine whether Petitioner's trial and appellate counsel's performances fell below prevailing professional norms, and whether, but for counsel's unprofessional errors, the outcome would have been different. *Strickland*, 466 U.S. at 694.

Because Petitioner Howard did not raise a claim of ineffective assistance of counsel on direct appeal, however, we must also determine whether Petitioner defaulted *that* claim under M.C.R. 6.508(D), and in doing so, determine whether cause and prejudice excused his failure to raise the issue on appeal. *See Edwards v. Carpenter*, 529 U.S. 446, 450-51 (2000) ("A procedurally defaulted ineffective-assistance-of-counsel claim can serve as cause to excuse the procedural default of another habeas claim only if the habeas petitioner can satisfy the "cause and prejudice" standard with respect to the ineffective-assistance claim itself."). We conduct this inquiry, not only to determine whether Petitioner has defaulted his challenge as to Chorney's and Carter's identifications, but also to determine whether he has defaulted his claim of ineffective assistance itself, as his third claim on this appeal.

Ineffectiveness of appellate counsel can suffice to show sufficient cause and prejudice for failure to raise an ineffective-assistance-of-counsel claim. Thus, we discuss below: (a) whether Petitioner's trial counsel was ineffective in failing to challenge the admission of Chorney's and Carter's identifications; (b) whether Petitioner's appellate counsel was ineffective for failing to raise a challenge to those identifications on appeal; and (c) whether Petitioner's appellate counsel was ineffective for failing to raise an ineffective-assistance-of-counsel claim.

The right to the effective assistance of counsel is guaranteed by the Sixth Amendment to the United States Constitution. *Roe v. Flores-Ortega*, 528 U.S. 470, 476 (2000). In order to prevail on an ineffective-assistance-of-counsel claim, a petitioner must satisfy a two-prong test. First, the petitioner must show that the performance of counsel fell "below the objective standard of reasonableness." *Strickland v. Washington*, 466 U.S. 668, 688 (1984). In so doing, the petitioner must rebut the presumption that counsel's "challenged action might be considered sound trial strategy." *Id.* at 689 (internal quotation marks omitted). The objective standard of reasonableness is defined in terms of prevailing professional norms. *Id.* at 688.

The second prong requires that the defendant "show there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine the confidence in the outcome." *Id.* at 694.

In this case, the district court held an evidentiary hearing for the express purpose of assessing trial counsel's shortcomings. In analyzing Howard's ineffective assistance claims, we consider "the totality of the evidence -- "both that adduced at trial, and the evidence adduced in the habeas proceeding[s]." *Wiggins v. Smith*, 539 U.S. 510, 536 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 397-98 (2000)) (emphasis omitted); *Clinkscale v. Carter*, 375 F.3d 430, 436 (6th Cir. 2004). We will defer to the findings adduced by the district court's hearing, yet make an independent judgment about the application of the facts to the law. We first examine the performance of trial counsel, then examine the performance of appellate counsel.

*a. Ineffective Assistance of Trial Counsel*

Petitioner Howard argues that his trial counsel was ineffective in three respects: first, for failing to challenge the admission of Chorney's and Carter's identification testimony prior to trial; second, for failing to cross-examine Carter regarding Carter's identification of a suspect other than the Petitioner at the June 10, 1989 photo lineup; third, for failing to object to the in-court identifications of the witnesses. Petitioner argues that these failings prejudiced him, because without the two identifications, there would have been little reliable direct evidence to convict him.

Anthony Walton, Petitioner's trial counsel, failed to challenge Chorney's and Carter's live lineup identifications. As determined at the evidentiary hearing, Walton challenged Gapinski's identification because he "thought that was the most significant or the strongest within the people's case." J.A. 751. As to the other two witnesses, he testified, "I guess I can't really justify at this particular point in time why the motion was only filed towards one of those witnesses." J.A. 756. When pressed further, Attorney Walton indicated that had he been able to establish a tainted identification with regard to the strongest witness, Gapinski, he would have then moved to exclude the identifications of the other two. When the trial court seemed undisposed to grant the motion with regard to Gapinski, Walton chose not to challenge Chorney and Carter because he thought it would be fruitless – "the arguments would have been cumulative . . . and I was under the opinion that the court would probably rule the exact same way." J.A. 766. Although he could not remember most of the details of his representation at the evidentiary hearing, Walton testified that he "probably" believed that it would have served his client better to save the cross-examination for the jury trial, and let the jury decide whether the identifications were credible. He might not have wanted to give the witnesses an opportunity to be prepared for the kinds of questions he might ask on cross-examination at trial.

In addition to failing to challenge Chorney's and Carter's identifications in a *Wade* hearing, Walton failed to make a contemporaneous objection to the in-court identifications at trial. At the evidentiary hearing, Walton testified that he was not familiar with the general principle that if counsel fails to raise an objection at the trial court, a defendant faces a more difficult standard of review on appeal. When questioned, he stated that he was not familiar with the contemporaneous-objection rule.

Finally, at the evidentiary hearing, Attorney Walton was questioned as to his alleged failure to cross-examine one of the witnesses, Carter, on Carter's earlier identification of a different suspect in a photo spread. Walton admitted that failure to cross-examine on that point would be a significant omission.

The district court found that Walton's failure to challenge Chorney's and Carter's pretrial lineup identifications was objectively unreasonable, based on prevailing professional standards. The court focused on Walton's initial inability to justify why he had failed to file a motion to suppress the two witnesses' identifications, as well as his later testimony that a witness's earlier failure to pick out the defendant in a photo spread was significant when that witness later identified the defendant in a live lineup. The district court also found, however, that the ineffectiveness did not prejudice Petitioner Howard, because the state

trial court would have been unlikely to grant the motion and there was sufficient evidence to convict Howard even apart from the two identifications. We agree with the district court on both counts.

### *i. Strickland Prong One: Objectively Unreasonable Representation*

We agree with the district court that, considered as a whole, Walton's failure to challenge these two identifications fell below an objectively reasonable standard of representation. We start with Walton's failure to object to the in-court identifications at trial. This failure does not appear to have been based on any tactical decision, but, rather, arose from trial counsel's ignorance of the law. By his own testimony, Walton was unaware that if he failed to raise an objection at trial, his client would face a stricter standard of review on appeal. He was not familiar with the contemporaneous-objection rule. We agree with the district court that this failure falls short of prevailing professional norms. To preserve issues on the record is one of the most basic duties of a trial lawyer, not to mention a criminal defense attorney. *See* ABA Standard 4-7.1(d) (1979) (stating that criminal defense attorney has a "duty to have the record reflect adverse rulings or judicial conduct which the lawyer considers prejudicial to his or her client's legitimate interests"). We therefore find that Walton's failure to object at trial amounted to objectively unreasonable representation.

We also agree that Walton's failure to make a pretrial motion to suppress Chorney's and Carter's identifications fell below reasonable professional standards. We recognize that trial counsel's strategic decisions are accorded strong deference. *See, e.g., McQueen v. Scroggy*, 99 F.3d 1302, 1311 (6th Cir. 1996), *overruled on other grounds*, *Abdur'Rahman v. Bell*, 392 F.3d 174 (6th Cir. 2004). In this case, however, Walton's failure to file a motion to exclude all three identifications, as opposed to only the one that he did, appears not to have been based on any tactical thinking. As he testified, "I guess I can't really justify at this particular point in time why the motion was only filed towards one of those witnesses." J.A. 756. Although Walton testified that he may have planned to move to suppress the two witnesses' testimony if the trial court granted the motion with regard to the state's strongest witness - Kenneth Gapinski - this is insufficient justification.

When faced with the possibility of removing two out of three eyewitnesses, a professionally competent defense attorney would at least raise the motion in order to preserve it for appeal. By his own testimony, Walton did not even know that he needed to raise an objection to preserve the issue. We find this performance fell below prevailing professional norms. *See, e.g.,* ABA Standard 4-3.6 (1979) (stating that "[m]any important rights of the accused can be protected and preserved only by prompt legal action," and that defense counsel should "consider all procedural steps which in good faith may be taken, including . . . moving to suppress illegally obtained evidence").

### *ii. Strickland Prong Two: Prejudice*

Having found that trial counsel's conduct fell short of prevailing professional norms, we turn to the second prong of the *Strickland* inquiry - put simply, whether Attorney Walton's conduct prejudiced Petitioner Howard. *See Strickland*, 466 U.S. at 694. In order to satisfy this second prong, Howard must show a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine the confidence in the outcome." *Id.* If we find that Howard's "counsel had not deprived him of any substantive or procedural right to which the law entitled him, . . . his claim did not satisfy the "prejudice" component of the *Strickland* test." *Williams v. Taylor*, 529 U.S. 362, 392-93 (2000) (citing *Lockhart v. Fretwell*, 506 U.S. 364 (1993)). We find that Howard was not prejudiced. Having found that his counsel's performance did not prejudice him under the *Strickland* inquiry, we also find that Howard has failed to establish "cause" to excuse procedural default.

Howard cannot establish prejudice under *Strickland*, because he cannot show that a motion to exclude Chorney's and Carter's identifications would have succeeded. Nor can he show that counsel's error had a significant impact upon his finding of guilt. In order to establish that a motion to exclude the

identifications would have succeeded, Howard must establish that his claim had merit. He must show both that the lineup procedure was unnecessarily suggestive and that, under the totality of the circumstances, the witnesses' identifications were not otherwise reliable. *See Neil v. Biggers*, 409 U.S. 188, 198 (1972); *Manson,* 432 U.S. at 114. This he cannot do. Simply described, the lineup procedure was only minimally suggestive. Neither Chorney nor Carter had significant opportunity to be influenced by their short exposure to Howard at the preliminary hearings. As important, their identifications were independently reliable of any suggestive lineup procedure.

As discussed above, we first assess whether the identification procedure used with Chorney and Carter was unnecessarily suggestive, then whether the identifications were nonetheless reliable. *Manson,* 432 U.S. at 114. We begin with the suggestiveness inquiry. Chorney gave limited testimony regarding his ability to observe Howard during the first and second scheduled preliminary hearings. He testified that he had no contact with the case between the shooting and the September 20, 1989, scheduled preliminary hearing. While acknowledging that he came to the proceeding with his family, Chorney was never asked if he saw Howard being brought into the court room. He testified that he "spent a lot of time in the hall" and was "out in one of the rooms smoking a cigarette." J.A. 243. Regarding the September 27, 1989, scheduled preliminary hearing that preceded the lineup, Chorney testified that he was not in the courtroom when Howard was brought in. He testified that as soon as he entered the courtroom, he was immediately asked to leave. At that point, Howard was seated at the defense counsel table and Chorney "seen the back of him." J.A. 244.

The record presented with the petition is not clear regarding what, if any, contact witness Carter had with Howard at the time of the preliminary hearings. Carter had not seen Howard between the June shooting and the September court proceedings. Carter's total testimony regarding his observation of Howard at the September 20, 1989, hearing was: "I seen him, the back of him sit down." J.A. 266. On September 27, 1989, Carter returned to court for the rescheduled preliminary hearing. Carter testified that on that date, he saw Howard being brought from the rear of the court room to the defense table. The preliminary hearing quickly adjourned to allow the lineup. Thomas Carter had only a limited opportunity to observe Howard at the time of the preliminary hearings.

Using the standard of unnecessary suggestiveness described earlier, we find that Howard fails to establish that the techniques associated with Chorney's and Carter's identifications were unnecessarily suggestive. Chorney and Carter observed Howard for only a very brief period. Nothing suggests they got a good look at his face during the September 20 and 27 hearings. Law enforcement officials made no statement to them. While observing a defendant in police custody has some suggestion that police had focused on Howard, we do not find the procedures associated with the identifications unnecessarily suggestive.

Moreover, Chorney's and Carter's identifications were independently reliable. As described above, in judging reliability, we consider the totality of the circumstances, including the following factors: (1) the opportunity of the witness to view the defendant at the initial observation; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the defendant; (4) the level of certainty shown by the witness at the pretrial identification; and (5) the length of time between the initial observation and the identification. *Manson*, 432 U.S. at 114; *Biggers*, 409 U.S. at 199-200. We must weigh these factors against any "corrupting effect of the suggestive identification." *Manson*, 432 U.S. at 114.

Both Patrick Chorney and Thomas Carter had good opportunities to view the perpetrator. Chorney, seated in the passenger's seat of the tow truck, was three feet from the shooter during the time Hankinson argued with the man on the porch. He testified that this exchange "lasted a moment, long enough for [ ] each [to get] their views across," J.A. 234, and that he looked at the person "long enough to see what was going on." The shooter also turned the gun on Chorney, and told him to put the phone down. As Chorney testified, he saw the perpetrator "[o]nce or twice for a few minutes . . . long enough for him to tell me to put the phone down and watch him argue with Ted." J.A. 208, 209.

After the truck had proceeded down the driveway and Hankinson had been shot, Chorney looked back once and saw the shooter still standing on the porch, picking up shell casings. Chorney testified that at that point, he was about 15-20 feet away from the porch and the perpetrator. Thus, Chorney had an excellent chance to observe the shooter.

Similarly, Carter had a good opportunity to observe the shooter, although for less time than Chorney and Gapinski had. Carter, who was sitting in the back end of the pickup truck, testified that he saw the person "[w]hen he first came out on the porch." J.A. 252. When the truck pulled along side the house, Carter was "not even 10, 12 feet" from the people on the porch. J.A. 249. He testified that as the tow truck proceeded down the driveway, he saw the perpetrator, who had begun to fire: "A couple of shots came out and Kenny got up and I told Kenny to get back down . . . and I got back down with him and he got back down." J.A. 251. "When he seen me and Kenny getting back up . . . he did level [his gun] at us and that's when we had to get back down 'cause I said he's going to shoot us." J.A. 254. Although Carter testified that he could not see the person's facial features at the time the shooter aimed at him, he also testified that he could see the perpetrator's face after Hankinson got shot, when the shooter was picking up shell casings. Thus, we find that Carter had a good chance to see the shooter.

Both Chorney and Carter were also attentive to the shooter. Beginning with the repossession itself, both were on heightened alert. This heightened attention became greater when the shooter began to fire shots. *See United States v. Meyer*, 359 F.3d 820, 826 (6th Cir.2004) (finding heightened degree of attention where witness spoke with robber and studied his features while looking for an opportunity to escape); *United States v. Crozier*, 259 F.3d 503, 511 (6th Cir. 2001) (finding heightened degree of attention where robber confronted the witnesses with a gun). Everything suggests that both Chorney and Carter were alert to the shooter.

The third *Biggers/Manson* factor directs us to consider the accuracy of the witnesses' prior descriptions. In this case, neither Carter nor Chorney earlier gave detailed descriptions of the shooter. Carter described the killer: "Black/male/20s, light complx [sic], short hair, thin mustache I think, he was dressed in underwear (boxer shorts)." J.A. 509. Chorney described the shooter to the police as: "Black male. I only seen him from the chest up, he was a smaller build. I would say he had real short hair but I only seen him for like a couple of seconds." J.A. 514-15.

Carter's description of Petitioner as having a light complexion contradicts other evidence, produced by Petitioner Howard, showing that Howard had a dark complexion and long nose. At trial, however, testimony suggested that the yellow porch light at the scene of the repossession gave the perpetrator a lighter hue. Thus, while the earlier description makes the identification somewhat less reliable, it is not fatal. As discussed above, our cases have found identifications otherwise reliable even when there are discrepancies in an earlier description. *See, e.g., United States v. Meyer,* 359 F.3d 820 (6th Cir. 2004).

Next we consider the level of certainty shown by the witness at the pretrial identification. Carter attended the lineup and, out of the presence of Chorney and Gapinski, identified Howard as the killer. Carter testified that he was "very sure" of the identification. Chorney also identified Howard as the killer without equivocation. The certainty of witnesses Chorney and Carter supports the reliability of the identifications they made.

Finally, we consider the length of time between the shooting and the identifications. Here, the lineup followed the shootings by about three months. As we determined above, three months between the initial observation and the challenged identification is not a long period of time. *See United States v. Causey,* 834 F.2d 1277, 1286 (6th Cir. 1987) ("A three to four-month delay between the crime and the identification does not render the identification inherently unreliable").

Most damaging for the reliability of Chorney's and Carter's identifications is their prior failure to identify the Petitioner in a photo lineup. Just hours after the incident, Chorney and Carter went to the police

station to place a report. While there, they were each shown a photo lineup, with black and white photographs, which included Petitioner Howard as suspect No. 1. However, Chorney and Carter failed to identify the Petitioner. Instead, Chorney and Carter each appear to have picked out a different suspect, one placed at No. 4.

Some evidence suggests that Chorney and Carter failed to choose anyone in the early photo lineup. Sergeant Harvel, the police officer who conducted the initial photo lineup, testified at the district court's evidentiary hearing that the phrase "No I.D." written at the bottom of an identification record, as was the case with Chorney's and Carter's records, meant that no suspect had been identified. Harvel stated that the "X"'s marked next to suspect No. 4 might mean the suspect was someone else whom the police thought was a viable suspect. Harvel's testimony, however, contradicted the earlier trial testimony of Chorney, which suggested that Chorney had identified someone. Chorney's and Carter's records were identical.

Chorney's and Carter's inability to identify Petitioner in a 6-person photo lineup just hours after the incident somewhat undermines the reliability of an identification they made three months after the incident. It is not, however, fatal. To our eyes, the picture of suspect No. 4 is very similar to Howard's picture, positioned at No. 1. J.A. 715-16. Further, an earlier failure to identify, or even a positive identification of a different suspect, does not require exclusion of an in-court or pretrial identification, if otherwise reliable. *See, e.g., United States v. Meyer*, 359 F.3d 820 (6th Cir. 2004) (allowing in identification despite earlier failure to identify defendant in a photo array); *United States v. Black*, 412 F.2d 687, 689 (6th Cir. 1969) (same); *United States v. Causey*, 834 F.2d 1277 (6th Cir. 1987) (same); *United States. v. Hamilton*, 684 F.2d 380, 383 (6th Cir. 1982) (same); *United States v. Dobson*, 512 F.2d 615, 616 (6th Cir. 1975) (in pre-*Manson* case, allowing in-court identification testimony despite witness's selection of a different person earlier in his testimony).

An earlier failure to identify can be considered in judging the weight of the in-court identification and may be considered as one factor affecting the reliability of the earlier identification. Standing alone, it does not make the earlier identification unreliable under the *Biggers/Manson* due process inquiry.

Under the totality of the circumstances, then, Chorney's and Carter's identifications were sufficiently reliable to present them to the jury, even if the identification procedure had been suggestive. Because we find that Chorney's and Carter's identifications were properly admitted, we find that any challenge to their admissibility would not have succeeded. We thus find that trial counsel's failure to raise the challenge did not prejudice Petitioner. *See Keller v. Larkins*, 251 F.3d 408, 419 (3d Cir. 2001) (concluding that counsel's alleged failure to object to admission of incriminating evidence was not prejudicial because evidence would have been admitted anyway, since under state law, testimony was admissible).

### b. Ineffective Assistance of Appellate Counsel

In reviewing whether Petitioner's appellate counsel was constitutionally ineffective, we need not analyze both prongs of the *Strickland* inquiry, because we find that the claim fails on the second prong. *See Strickland v. Washington*, 466 U.S. 668, 694 (1984) (directing that courts need not address both components of the inquiry "if the defendant makes an insufficient showing on one"). Because we find that no prejudice attended trial counsel's errors, we also find that Petitioner was not prejudiced by any failure on the part of appellate counsel to raise the due process challenge on appeal. In addition, we find that appellate counsel's failure to raise an ineffective-assistance-of-counsel claim did not prejudice Petitioner.

Counsel's failure to raise an issue on appeal is ineffective assistance only if there is a reasonable probability that inclusion of the issue would have changed the result of the appeal. *Greer v. Mitchell*, 264 F.3d 663 (6th Cir. 2001). In this case, the due process challenge, not having been raised at trial, would likely have been reviewed for plain error. As we have described, such a challenge would not itself have changed the result. There was not a reasonable probability that the Michigan Court of Appeals would have been more persuaded by the challenge to the more vulnerable identifications by Chorney and Carter, than the challenge to Gapinski's testimony.

Similarly, a claim of ineffective assistance of trial counsel would not have changed the result of the appeal, because, as we have found, Petitioner did not have a valid ineffective assistance claim. Because we find insufficient evidence of resulting prejudice, we conclude that Howard has not met the *Strickland* standard.

Having found that neither Howard's trial counsel's performance nor his appellate counsel's performance prejudiced him under the *Strickland* inquiry, we thus find that Howard has failed to establish "cause" to excuse procedural default. Although we need not reach the "prejudice" prong of the "cause and prejudice" test, we note that Howard's failure to establish prejudice under *Strickland* also obviates his claim of prejudice under that standard. *See United States v. Frady*, 456 U.S. 152, 170 (1982) (holding that habeas petitioner has "the burden of showing, not merely that the errors at his trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions") (emphasis omitted); *Rust v. Zent*, 17 F.3d 155, 161–62 (6th Cir. 1994) ("[T]he prejudice component of the cause and prejudice test is not satisfied if there is strong evidence of a petitioner's guilt and a lack of evidence to support his claim.").

## IV. CONCLUSION

In sum, we find that the Michigan Court of Appeals was reasonable in rejecting Petitioner Howard's due process challenge to Gapinski's identification. In addition, we find that Petitioner procedurally defaulted his claim as to Chorney and Carter's identifications. Similarly, we find that Petitioner defaulted his ineffective assistance of counsel claims. Petitioner has not established cause and prejudice to excuse the default. For the foregoing reasons, this Court **AFFIRMS** the district court in denying the writ of habeas corpus.

---

**DISSENT**

---

KAREN NELSON MOORE, Circuit Judge, dissenting.  Because I believe that we should not raise the issue of procedural default sua sponte, and that the eyewitness identifications in this case violated due process, I respectfully dissent.

I find it troubling that the majority has raised procedural default in this case despite the Supreme Court's instruction in *Trest v. Cain*, 522 U.S. 87 (1997), that "procedural default is normally a defense that the State is obligated to raise and preserv[e] if it is not to lose the right to assert the defense thereafter." *Id.* at 89 (internal quotation marks and citation omitted).  While we have held that we have the discretionary power to raise issues of procedural default sua sponte, *see Elzy v. United States*, 205 F.3d 882, 886 (6th Cir. 2000), I believe that this is an inappropriate case to exercise such discretion.  *See Baze v. Parker*, 371 F.3d 310, 320 (6th Cir. 2004) (concluding that because the state decided to challenge the defendant's claims on the merits, rather than arguing procedural default, the state had waived this defense).  Where, as here, the record indicates that the prosecution made the conscious decision not to assert procedural default, instead choosing to argue the case on its merits, we ought to decline to consider procedural default as a defense. *See Yeatts v. Angelone*, 166 F.3d 255, 262 (4th Cir.), *cert. denied*, 526 U.S. 1095 (1999) (indicating that when it is evident that the state intentionally declined to raise procedural default as a defense the court should be wary of raising the issue sua sponte); *Smith v. Horn*, 120 F.3d 400, 409 (3d Cir. 1997), *cert. denied*, 522 U.S. 1109 (1998) (suggesting that in raising the defense sua sponte, federal courts must be wary of "acting as advocates for the state rather than as impartial magistrates").

I also disagree with the majority's application of the *Biggers* test in this case, as the identification procedures employed were unduly suggestive and the eyewitness identifications lacked sufficient independent indicia of reliability.  At the outset, I fail to see how the majority can deem the highly improper identification procedures employed by the police as "only minimally suggestive."  Even the state in its brief concedes that the district court properly concluded that the line-up procedure employed was unduly suggestive.  Respondent Br. at 16 (noting that it is undisputed that the witnesses' observance of Howard in the courtroom prior to identifying Howard as the shooter was unduly suggestive); *see also* J.A. at 701 (D. Ct. Op. at 11) (indicating that permitting the witnesses prior to the line-up to observe Howard in the courtroom under circumstances suggesting that Howard was the defendant was "impermissibly suggestive").  Furthermore, we have in the past deemed as unduly suggestive courtroom contact between a defendant and a witness under circumstances similar to those presented in this case.  *See Thigpen v. Cory*, 804 F.2d 893, 896 (6th Cir. 1986), *cert. denied*, 482 U.S. 918 (1987) (procedure employed was unduly suggestive where witness was unable to identify the defendant until the witness sat next to him at a codefendant's trial); *see also United States v. Bouthot,* 878 F.2d 1506, 1516 (1st Cir. 1989) (procedure was unduly suggestive where police-officer witness observed the defendant in state court prior to identifying the defendant); *United States v. Rogers*, 126 F.3d 655, 658 (5th Cir. 1997) ("it is obviously suggestive to ask a witness to identify a perpetrator in the courtroom when it is clear who is the defendant"); *United States v. Emanuele*, 51 F.3d 1123, 1130 (3d Cir. 1995) (concluding that the procedure was unduly suggestive where the witnesses observed the defendant being brought out of the courtroom prior to identifying the defendant).  As a result, I would conclude that the witnesses' multiple observations of Howard in the courtroom seated at the defense table,[1] one of which occurred a mere hour before the live line-up, were nothing short of unduly suggestive.

Additionally, despite the majority's position to the contrary, there are insufficient independent indicia of reliability to bolster the three witnesses' identifications of Howard as the shooter.  The record

---

[1]Two of the eyewitnesses, Gapinski and Carter, also testified to having seen Howard being brought into the courtroom by court security and seated at the defense table during at least one of the two aborted preliminary hearings.

suggests that both Chorney and Carter selected the wrong individual as the shooter when presented with the photo array immediately following the shooting. The majority contends that this misidentification is only minimally problematic as the men depicted in photograph one (the photograph of Howard) and photograph four (the photograph selected by the witnesses as the shooter) resemble one another. I disagree with the majority's assessment of these two photographs, as the men depicted in them do not look at all similar to me. I believe this misidentification by Chorney and Carter therefore severely undercuts the reliability of their later identifications of Howard.

The majority's assessment of the third *Biggers* factor, the accuracy of a witness's prior description of the criminal, is also flawed. The majority focuses on the fact that the witnesses' prior descriptions of the shooter were not inaccurate. The majority fails to consider, however, the fact that reliability can be undercut not only by inaccurate prior descriptions but also by a sparse prior description which becomes more detailed as a result of an unduly suggestive identification procedure. *See Thigpen*, 804 F.2d at 897 (noting that accuracy refers not only to whether a prior description matches a suspect but also "how *particularly* a description matches a suspect") (emphasis in original); *see also Raheem v. Kelly*, 257 F.3d 122, 138 (2d Cir. 2001), *cert. denied*, 534 U.S. 1118 (2002) ("Nor do the descriptions of the shooter given by [the witnesses] instill any confidence as to the reliability of their identifications . . . for though they provided general information as to the shooter's age, height, and weight, they provided virtually no detail about his face."). In this case, that the witnesses described the shooter in exceedingly general terms and only mentioned Howard's distinctive hair style and facial features after observing him in the courtroom weakens the reliability of their identifications.

Finally, the other *Biggers* factors do not indicate that there are sufficient independent indicia of reliability to overcome the unduly suggestive identification procedures employed in this case. I agree with the majority that the witnesses had a good opportunity to observe the shooter while they attempted to repossess Schumate's truck. I am disinclined, however, to believe that the witnesses were exceedingly focused on the shooter's physical characteristics rather than the weapon he was carrying, particularly after the shooter began shooting at the tow truck. *Raheem*, 257 F.3d at 138 (suggesting that "it is human nature for a person toward whom a gun is being pointed to focus his attention more on the gun than on the face of the person pointing it"); Roger Handberg, *Expert Testimony on Eyewitness Identification: A New Pair of Glasses for the Jury*, 32 Am. Crim. L. Rev. 1013, 1018-19 (1995) (explaining that research indicates that "witnesses exposed to violence are better at recalling the perpetrator's general actions than they are at describing the perpetrator."). Additionally, while all three witnesses expressed certainty that the identification of Howard as the shooter was accurate, their conviction should be skeptically viewed under the circumstances of this case. *See Rogers*, 126 F.3d at 659 (noting that certainty should not be given undue weight where there has been an in-court observation of the defendant prior to identification as "[e]ven the best intentioned among us cannot be sure that our recollection is not influenced by the fact that we are looking at a person we know the Government has charged with a crime"). Finally, while the three months that elapsed between the shooting and the live line-up is not a great length of time, it does not bolster the faulty identifications which occurred in this case.

For all these reasons, I dissent from the majority's denial of Howard's petition for habeas relief.